*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 11a0228p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

WILLIAM T. MONTGOMERY,
     *Petitioner-Appellee/Cross-Appellant,*

     *v.*

DAVID BOBBY, Warden,
     *Respondent-Appellant/Cross-Appellee.*

Nos. 07-3882/3893

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 00-07298—Solomon Oliver, Jr., Chief District Judge.

Argued: June 9, 2010

Decided and Filed: August 22, 2011

Before: BATCHELDER, Chief Judge; MERRITT, MARTIN, BOGGS, MOORE,
COLE, CLAY, GILMAN, GIBBONS, ROGERS, SUTTON, McKEAGUE,
GRIFFIN, KETHLEDGE, and WHITE, Circuit Judges.[*]

_____

**COUNSEL**

**ARGUED:** Benjamin C. Mizer, OFFICE OF THE OHIO ATTORNEY GENERAL,
Columbus, Ohio, for Appellant. Richard M. Kerger, KERGER & HARTMAN, LLC,
Toledo, Ohio, for Appellee. **ON BRIEF:** Benjamin C. Mizer, Elisabeth A. Long,
Stephen E. Maher, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio,
for Appellant. Richard M. Kerger, KERGER & HARTMAN, LLC, Toledo, Ohio, Lori
Ann McGinnis, Mount Gilead, Ohio, for Appellee.

     GIBBONS, J., delivered the opinion of the court, in which BATCHELDER, C. J.,
BOGGS, GILMAN, GIBBONS, ROGERS, SUTTON, MCKEAGUE, GRIFFIN, and
KETHLEDGE, JJ., joined, with BATCHELDER, C. J. (pp. 26–31), delivering a separate
concurrence and WHITE, J. (pp. 32–33), delivering a separate opinion concurring in the
judgment. MERRITT, J. (pp. 34–39), delivered a separate dissenting opinion, in which
Judge MARTIN joined, with MARTIN, J. (p. 40), also delivering a separate dissenting
opinion. CLAY, J. (pp. 41–69), delivered a separate dissenting opinion, in which
MOORE and COLE, JJ., joined.

_____

[*]The Honorable Deborah L. Cook, Circuit Judge, took no part in the consideration or decision
of the case.

———————————

**OPINION**

———————————

JULIA SMITH GIBBONS, Circuit Judge.  In this death penalty case, Warden David Bobby appeals the district court's order granting William T. Montgomery's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 and its denial of the State's subsequent motion to reconsider that order under Federal Rule of Civil Procedure 59(e).  *See Montgomery v. Bagley*, 482 F. Supp. 2d 919 (N.D. Ohio 2007).  Although Montgomery asserted forty-eight grounds for relief in the petition, the district court granted the writ based upon a single ground:  the State's non-disclosure of an exculpatory pretrial police report, in which several witnesses claimed to have seen one of the victims alive several days after her alleged murder, violated the Supreme Court's precedent in *Brady v. Maryland*, 373 U.S. 83 (1963).  Montgomery, in turn, cross-appeals the district court's denial of his petition on several alternative grounds, including the trial court's retention of a juror undergoing psychiatric treatment, the trial court's denial of Montgomery's motion to change venue in light of negative pretrial publicity, and the State's non-disclosure of other allegedly exculpatory evidence.  For the reasons that follow, we reverse the district court's issuance of the writ of habeas corpus and affirm the district court in all other respects.

I.

On the morning of March 8, 1986, the police found Cynthia Tincher's body in her car at the corner of Angola and Wenz Roads in Toledo, Ohio.  She had been killed by a single gunshot wound to the head.  On the same morning, when Tincher's roommate, Debra Ogle, failed to appear for work, the police listed Ogle as missing.  The police located Ogle's abandoned car the following day, although no sign of Ogle existed. On March 11, 1986, acting on a tip from a jailhouse informant, Michael Clark, the police located and questioned Glover Heard in connection with the murder of Tincher and the disappearance of Ogle.  At approximately 2:30 p.m. that afternoon, the police brought Heard to the station house, where he provided an initial statement, offering the name of

Edward Bruce Ellis as an alibi witness. When interviewed about Heard's alibi on March 11, Ellis, in turn, gave the police the name of the petitioner, William Montgomery.

At about noon on March 12, 1986, while Ogle still remained missing, the police located Montgomery at the home of his uncle, Randolph Randleman. Montgomery stated that he knew the police were looking for him and that he wanted to discuss the homicide. The police then arrested Montgomery pursuant to an outstanding forgery warrant and brought him to the station house, where he was questioned about the death of Tincher and disappearance of Ogle. During the interview, Montgomery admitted that his gun, a Bersa .380-caliber semi-automatic pistol, was the murder weapon. In his initial statement, Montgomery claimed that, following a night of drinking, he gave Heard the pistol in the early morning hours of March 8 for Heard's self-protection on his walk home. Montgomery further claimed that Heard had returned the gun to him later that morning with an empty six-round clip and told Montgomery that Heard had shot and killed both Tincher and Ogle. Montgomery stated that Heard had not disclosed the location of Ogle's body. During subsequent questioning that afternoon, Montgomery changed his statement, admitting that he and Heard had taken a taxi to Tincher and Ogle's apartment on Hill Avenue on the morning of March 8, where they asked Ogle for a ride home. Montgomery stated that Ogle provided a ride to both men after she finished getting ready for work and dropped Montgomery off at his apartment first. He maintained, nevertheless, that Heard had killed both women with his Bersa .380, which Heard had borrowed.

During questioning, Montgomery insisted that, if the police recovered his gun, they would find that it was, in fact, the murder weapon that Heard had used. In an effort to locate the gun, the police permitted Montgomery to make several phone calls. After the calls, Montgomery's mother, Caroline Jones, called the police station and arranged to meet an officer at the Way-Lo gas station near the airport at approximately 6 p.m. Upon meeting the officer, Jones turned over a bag containing a loaded .380-caliber semi-automatic pistol.

On the evening of March 12, 1986, the police formally charged Montgomery with the aggravated murder of Tincher. At this point, Montgomery informed the police that he could help them locate Ogle's body near a market on Hill Avenue. Although he continued to implicate Heard as the killer—and stated that Heard had driven him by the location of Ogle's body—Montgomery directed the police to a wooded area separated by a field off of Hill Avenue, which he identified as the location. As Montgomery waited in the patrol car with Sergeant Larry Przeslawski, officers began searching the wooded area to the left of the field. Montgomery then told Sergeant Przeslawski to instruct the officers to search the wooded area to the right of the field, where Ogle's body was recovered.

On March 25, 1986, the Lucas County Grand Jury returned a two-count indictment charging Montgomery with the aggravated murders of Ogle and Tincher while committing or attempting to commit aggravated robbery, in violation of Ohio Rev. Code Ann. § 2903.01(B) (West 2002). On September 29, 1986, the case proceeded to a jury trial, in which the State argued that Montgomery murdered Ogle while robbing her with the use of a deadly weapon and, in a continuous criminal enterprise, then murdered Tincher, as she was the only person who could place Montgomery with Ogle that morning. To support this theory, the State presented thirty-two witnesses, including several police officers and Heard, who had also been indicted for the aggravated murders of Ogle and Tincher, but who pled guilty to one count of complicity to murder. At trial, the State presented the following evidence through witness testimony and exhibits:

> • Montgomery had purchased a .380 caliber semi-automatic pistol and ammunition just weeks before the murders . . . [and] was wearing a dark hooded jacket with the hood tied tight around his face when he entered the gun shop to purchase the pistol;
>
> • Montgomery and [Tincher and Ogle] were acquaintances . . . [and] [b]oth young women were alive the night of March 7th and the early morning hours of March 8th;
>
> • Montgomery, Heard, another friend, Bruce Ellis, and Montgomery's then girlfriend, Louren, went out drinking on the night of March 7th;
>
> . . . .

• Montgomery was wearing a blue pin striped suit jacket and jeans that night;

• Later in the morning of March 8th, Montgomery, Louren, and Heard went to Montgomery's uncle's house, where a very drunk Montgomery was arguing with Louren until his uncle broke it up;

• After defusing the argument, Montgomery's uncle, Randleman, took a gun away from Montgomery and put it and its clip on top of the refrigerator;

. . . .

• Montgomery and Heard then left the Randleman residence, both passing through the kitchen where the gun was on top of the refrigerator, to get in a cab;

• Montgomery was armed with a .380 caliber pistol the morning of March 8th;

• The cab took Montgomery and Heard to Ogle and Tincher's apartment on Hill Avenue at Montgomery's direction, [where] . . . [b]oth Montgomery and Heard entered the apartment;

• Ogle was getting ready to go to work and Tincher, although she popped out to say hello, was still in bed;

• Ogle agreed to give Montgomery and Heard a ride to Montgomery's mom's apartment on Airport Road;

• Montgomery, sitting in the front seat, gave Ogle the directions and eventually told her to stop on the side of the road on Hill Avenue;

• Ogle and Montgomery got out of her car and walked roughly forty yards into a field or wooded area off Hill Avenue;

. . . .

• Heard heard two gunshots [and] . . . saw Ogle's body laying on the ground;

• Montgomery rushed back to Ogle's car and motioned for Heard to get in the front passenger's seat as Montgomery got into the driver's seat . . . [and] drove Ogle's car back to the victims' apartment complex;

• Montgomery picked a gun up off the floor of the car, exited the vehicle, and told Heard to take the car;

• Heard then left in the car and took Ogle's wallet as he abandoned the car roughly one block from his home;

• A black person wearing a dark hooded jacket with the hood tied tight around her or his face left Tincher's car the morning Tincher was found at Angola and Wenz Roads;

• On March [8]th, Montgomery, with Heard and [friends Eric Wilson and Sidney] Armstead, took the blue pin striped suit jacket he wore the night before to the cleaners;

• The gun Randleman put on top of the refrigerator was not there the next morning, March [8]th[,] [and] . . . [a] bullet, consistent with the type that could be used in Montgomery's gun which was identified as the murder weapon, was found in Tincher's room in Tincher and Ogle's apartment;

• Ogle's car was found roughly one block from Heard's home by police on March 9th[,] [and] . . . Ogle's wallet was found in Heard's dresser drawer;

• A black hooded jacket and a semi automatic pistol manual were found in Montgomery's mother's apartment;

• Tincher died from a gunshot wound to the head, which entered from the right side (passenger side since Tincher was sitting in the driver's seat of her car)[,] [and] . . . Ogle died from a gunshot wound to the head;

• All the discharged bullets and casings at both scenes were fired from the .380 caliber semi automatic pistol that Montgomery's mother gave police, which was the same gun Montgomery purchased just weeks earlier—the .380 caliber Bursa [sic] semi automatic pistol; and

• Montgomery led the police to the wooded area where Ogle's body was discovered.

*Montgomery*, 482 F. Supp. 2d at 927–28 (internal record citations omitted). Additionally, employees of One Hour Martinizing, the dry-cleaning business where Montgomery allegedly deposited the pin-striped suit jacket for cleaning, testified for the prosecution. *State v. Montgomery*, No. L-98-1026, 1999 WL 55852, at *2 (Ohio Ct. App. Feb. 5, 1999). Although they could not identify Montgomery, the dry-cleaning employees testified that on March 8, 1986, a black male brought in a soaking wet, dark blue pin-striped suit jacket to be cleaned in one hour. *Id.* The employees hung the jacket to dry, explaining that it would need to dry before it could be cleaned. *Id.* In her trial testimony, one employee remarked that the jacket was stained on both the outside and the lining, made a "brownish dripping mess on the floor," and had to be cleaned

three times with a chemical cleaner to remove the stains, which she could not identify. *Id.* Police later obtained the jacket, which Randleman identified as the one that he had loaned to Montgomery. *Id.*

In his defense, Montgomery's counsel did not present any witnesses but rather attempted to raise reasonable doubt as to Montgomery's guilt by cross-examining and impeaching the State's witnesses. Defense counsel focused particularly on impeaching Heard's testimony, which counsel described as "the crux of the state's case." First, the defense impeached Heard by demonstrating that he had pled guilty to complicity to murder and agreed to testify pursuant to a deal, under which the State dropped two aggravated murder charges and a charge of gross sexual imposition involving a five-year old. Second, during the cross-examination of Detective Arthur M. Marx, the State's chief investigative officer, defense counsel elicited testimony that Marx had told Heard that he could not have seen Ogle's body from his position in the car following the gunshots. Third, the defense emphasized during cross-examination that Heard had given the police various, conflicting accounts of the murders: (1) he contended that he knew nothing about the murders; (2) he implicated Montgomery as the killer; (3) he stated that he had observed a drug dealer driving Ogle's car down an alley; and (4) he said that an unknown black male at a carwash mentioned that two white women had been killed. Fourth, the defense noted that, although Heard testified as to having heard two gunshots in connection with Ogle's death, the coroner stated that Ogle's body had three gunshot wounds. Finally, as to the robbery motive, Heard admitted during cross-examination that, due to the cold, he planned to take Ogle's car regardless of Montgomery's instructions to do so and that they had not discussed robbing anyone that night. Sergeant Przeslawski also testified that Ogle's car was found behind an abandoned house near Heard's home and that Ogle's wallet was recovered from Heard's dresser drawer.

Beyond impeaching Heard, defense counsel highlighted several additional flaws in the prosecution's case. For example, defense counsel noted that none of the witnesses who saw the person fleeing the area where Tincher's body was found could determine that person's gender, nor could they ascertain the color of the hooded jacket. The

defense also noted that Montgomery did not have a hooded jacket with him on the evening of March 7, 1986, and that Montgomery had money with him that night, thus calling into question his motive to steal Ogle's car. Moreover, when leaving Randleman's home, both Montgomery and Heard passed through the kitchen where the pistol that Randleman took from Montgomery was located. No fingerprints were found on either the murder weapon or on the cars belonging to Ogle and Tincher. Finally, notwithstanding other factual inconsistencies in his account of the murders, Montgomery consistently implicated Heard as the killer and stated that Heard had shown him the area where Heard had killed Ogle.

At the conclusion of the trial, the jury convicted Montgomery of the aggravated murder of Ogle, with the specifications that the murder involved the purposeful killing of two or more persons and that Montgomery was the principal offender while attempting to commit aggravated robbery. The jury also convicted Montgomery of the murder of Tincher. Following the mitigation phase, the jury recommended that Montgomery be sentenced to death, and the trial court concurred with this recommendation, ordering Montgomery's execution.[1]

## II.

After his conviction was upheld on direct appeal by the Ohio Supreme Court, Montgomery submitted seventy claims for post-conviction relief in state court, which were denied after the State successfully sought summary judgment. The Ohio Court of Appeals reversed and remanded on the ground that the trial court failed to provide Montgomery an adequate opportunity to respond to the State's motion. Although Montgomery was permitted to respond on remand, the trial court again denied his claims for relief, and the Ohio Court of Appeals affirmed this decision. In particular, the Ohio Court of Appeals rejected Montgomery's fiftieth claim for relief, in which he argued that

---

[1]The dissent challenges the majority's recitation of the factual record and accuses the majority of "glossing over the veracity and credibility problems affecting several pieces of inculpatory evidence." From there, the dissent undertakes a *de novo* review of the record, citing its obligation to "grapple with a case's relevant facts as found by the state court." We have reviewed the record with due deference to the state court and reject the dissent's approach of reweighing evidence that was presented to and considered by the jury—an approach that is not in accord with AEDPA's constraints.

the State wrongfully withheld an exculpatory pretrial police report concerning Ogle, taken at a time when Ogle was still considered missing. *See Montgomery*, 1999 WL 55852, at *8. The police report, which indicated that it was taken on March 12, 1986, at 2:30 a.m., stated that David Ingram and several other witnesses—who were all high school classmates of Ogle—had seen her alive in her apartment complex parking lot at approximately 1:20 a.m. on March 12. The report read in pertinent part:

> [Ingram] stated that he and several friends were at the Oak Hill apartments on Hill when they saw a Blue Ford Escort with Debbie Ogle driving around the complex. Later they again saw her as a passenger in the same auto. Debbie Ogle waved to them as they knew her from Rogers High School. She was with [a] white male with long side burns [sic]. She did not appear distressed.

*Id.*

The Ohio Court of Appeals rejected this claim, remarking that, although Ogle was considered missing at the time of Ingram's report, "her car had been discovered abandoned behind a home several blocks from the home of the co-defendant Glover Heard." *Id.* The court further stated that:

> The lower court concluded that this isolated information, recorded in the course of an ongoing investigation when all of the facts were still being pieced together and in the face of overwhelming evidence presented at trial that Ogle had been killed on March 8, 1986, did not undermine confidence in the outcome of the trial. We agree and conclude that the trial court did not err in dismissing the fiftieth claim for relief.

*Id.* The Ohio Court of Appeals also rejected all other grounds for post-conviction relief, and the Ohio Supreme Court declined review of that decision.

Having exhausted his avenues for post-conviction relief in state court, Montgomery then filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of Ohio, in which he alleged forty-eight grounds for relief. The district court reviewed each ground and eventually denied all of Montgomery's claims except for the alleged *Brady* violation, which was premised upon the undisclosed police report. *Montgomery*, 482 F. Supp. 2d at 1000–02. In evaluating

the *Brady* claim, the district court concluded that the State had indeed suppressed the police report, which emerged six years after the trial and only pursuant to a Freedom of Information Act request by the defense for police records. *Id.* at 971. Moreover, the district court found the report exculpatory because the alleged sightings of Ogle on March 12, 1986, undermined the prosecution's theory that she had been murdered on March 8 and could have impeached Heard's testimony. *Id.* Finally, the district court determined that Montgomery suffered prejudice, opining "that the withheld police report could have undermined Heard's testimony, which was the core of the State's case." *Id.* at 978. Thus, finding the report material under *Brady*, the district court issued a conditional writ of habeas corpus on this basis. *Id.* at 1002.

Following the issuance of the writ, a Toledo newspaper printed a story about the case, which noted that the district court's decision was based upon the undisclosed police report. Upon hearing the news, three of the witnesses responsible for the report, including Ingram, called the Toledo Police Department to retract their earlier statements. They stated that the woman they had seen on March 12, 1986, was not Debra Ogle but rather was her younger sister, Dianna Ogle. After the witnesses signed sworn affidavits to this effect, the State filed the affidavits and a Rule 59(e) motion, requesting the district court to reconsider Montgomery's writ on the basis of newly discovered evidence. The district court denied the Rule 59(e) motion, finding that the affidavits did not qualify as newly discovered evidence under Rule 59 and thus were not properly before the court.

III.

Because Montgomery filed his petition for a writ of habeas corpus after the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), we review *de novo* the district court's conclusions on issues of law and on mixed questions of law and fact and review its factual findings for clear error. *Armstrong v. Morgan*, 372 F.3d 778, 781 (6th Cir. 2004). Pursuant to AEDPA, a federal court shall not grant a habeas petition with respect to any claim that was adjudicated on the merits in the state court unless the adjudication resulted in a decision that: (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the

Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented to the state courts. *See* 28 U.S.C. § 2254(d); *Irick v. Bell*, 565 F.3d 315, 319–20 (6th Cir. 2009). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court's application of clearly established federal law to the facts of the prisoner's case was objectively unreasonable. *Id.* at 409–11.

The Supreme Court has made clear that § 2254(d), as amended by AEDPA, is a purposefully demanding standard. *See Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) ("If [§ 2254(d)] is difficult to meet, that is because it was meant to be."). And, although § 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems," it does not function as a "substitute for ordinary error correction through appeal." *Id.* (internal quotation marks omitted). Rather, to obtain relief, the state criminal defendant "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786–87. This "highly deferential standard for evaluating state-court rulings . . . demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) (internal citation and quotation marks omitted).

In construing the meaning of "unreasonable application" in § 2254(d)(1), the Court has emphasized that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 410; *accord Harrington*, 131 S. Ct. at 785; *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010). Moreover, the Court has admonished that a reviewing court may not "treat[] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review" and that "even a

strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 131 S. Ct. at 786; *Renico*, 130 S. Ct. at 1862 (stating that § 2254(d)(1) "creates 'a substantially higher threshold' for obtaining relief than *de novo* review" (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007))). It is with these principles in mind that we review Montgomery's claims.

## A.

The State challenges the issuance of the writ of habeas corpus on three grounds: (1) that the police report was not material to the disposition of Montgomery's trial because, even if he had been privy to the report, he cannot show a reasonable probability that the result of his trial would have been different; (2) that the district court did not properly defer to the state courts' resolution of Montgomery's *Brady* claim; and (3) that the police report is not evidence within the meaning of *Brady*. As to the first claim, the Ohio Court of Appeals determined that the undisclosed police report was not material to Montgomery's guilt or innocence because, "in face of [the] overwhelming evidence presented at trial that Ogle had been killed on March 8, 1986," the report did not undermine confidence in the outcome of the trial. *Montgomery*, 1999 WL 55852, at *8. This decision, the State argues, neither contravened nor unreasonably applied clearly established federal law. In reply, Montgomery contends that habeas was properly granted because the State withheld an exculpatory police report, and Montgomery suffered prejudice.

Although Montgomery argues that the district court "correctly conducted a *de novo* review of the [*Brady*] claim," in a habeas case, as here, review by the federal courts is limited. In this case, the State maintains that "[i]t is undisputable that the Ohio Court of Appeals applied the proper constitutional standards" and that "there [do] not appear to be any cases in which the Supreme Court has . . . reached a different result based on materially indistinguishable facts." Montgomery does not challenge this argument. Nor do the parties contend that the state court's decision was based upon an unreasonable determination of the facts in light of the evidence. Thus, under AEDPA, our review of the state court's decision is limited to whether the Ohio Court of Appeals unreasonably

applied *Brady* to the facts of Montgomery's case. *See Williams*, 529 U.S. at 413 ("Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case."). We conclude that the Ohio Court of Appeals did not unreasonably apply *Brady* when it rejected Montgomery's claim based upon the undisclosed police report.**2**

In *Brady*, the Supreme Court held that a criminal defendant's due process rights are violated if the prosecution suppresses exculpatory evidence that is material to the defendant's guilt or punishment. 373 U.S. at 87; *Strickler v. Greene*, 527 U.S. 263, 280 (1999). The law in *Brady* applies regardless of whether the defendant has expressly requested such evidence and encompasses both exculpatory and impeachment evidence. *Strickler*, 527 U.S. at 280 (internal citations omitted). In this respect, the *Brady* due process rule complements the criminal defendant's Sixth Amendment right to a trial by an impartial jury and preserves the criminal trial as "the chosen forum for ascertaining the truth about criminal accusations." *Kyles v. Whitley*, 514 U.S. 419, 440 (1995).

In order to establish a violation of *Brady*, Montgomery must show that the following three requirements are met: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler*, 527 U.S. at 281–82. In terms of the first requirement, the pretrial police report—which indicated that several witnesses had seen one of Montgomery's alleged victims alive four days after the State argued that he killed her—is favorable to Montgomery because it casts doubt on the State's theory of the case. As for the second requirement, it is undisputed that this pretrial police report was suppressed by the State. Indeed, Montgomery was not aware of it until six years after his trial, when it was disclosed pursuant to a formal request for police records. In terms of the third requirement for a *Brady* violation, however, the parties dispute whether

---

**2**Because we conclude that Montgomery was not entitled to the writ of habeas corpus on the basis of the alleged *Brady* violation, we need not, and therefore do not, address the State's remaining two issues.

Montgomery "has established the prejudice necessary to satisfy the 'materiality' inquiry." *Id*. at 282.

"Prejudice (or materiality) in the *Brady* context is a difficult test to meet . . . ." *Jamison v. Collins*, 291 F.3d 380, 388 (6th Cir. 2002). In order to establish prejudice, "the nondisclosure [must be] so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. at 281. But, the *Brady* standard is not met if the petitioner shows merely a reasonable *possibility* that the suppressed evidence might have produced a different outcome; rather, a reasonable *probability* is required.[3] *Id.* at 291 (stating that "[t]he District Court was surely correct that there is a reasonable *possibility* that either a total, or just a substantial, discount of [the witness's] testimony might have produced a different result" but that "petitioner's burden is to establish a reasonable *probability* of a different result" (citing *Kyles*, 514 U.S. at 434)); *see also United States v. Agurs*, 427 U.S. 97, 109–10 (1976) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."). "A reasonable probability is a 'probability sufficient to undermine confidence in the outcome.'" *Wilson v. Parker*, 515 F.3d 682, 701–02 (2008) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)); *see also Cone v. Bell*, 129 S. Ct. 1769, 1783 (2009).

In *Kyles*, the Supreme Court elaborated upon the materiality standard set forth in *Brady* and its progeny. 514 U.S. at 434–38. There, the Court explained that *Brady* materiality "is not a sufficiency of evidence test." *Id.* at 434. Nor does *Brady* "require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Id.* Ultimately, "[t]he question is not whether the defendant would more likely than not have received a different verdict with

---

[3]The dissent faults the majority for "contrast[ing] 'probability' with 'possibility'" and suggests that this comparison "tacitly chang[es] the meaning of the word 'probability' in the materiality context to require a likelihood of a different result for *Brady* materiality." As an appellate court, however, our interpretation of *Brady*'s requirements is—as it must be—guided by Supreme Court precedent. In citing *Strickler*, we have merely noted a distinction drawn by the Court and have not set forth a modified version of *Brady*'s reasonable probability standard.

the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* "In making this determination, we review the evidence 'collectively, not item by item.'" *Brooks v. Tenn.*, 626 F.3d 878, 892 (6th Cir. 2010) (quoting *Kyles*, 514 U.S. at 436). And, this circuit has repeatedly acknowledged that "[e]vidence that is merely cumulative to evidence presented at trial is not material for purposes of *Brady* analysis." *Id.* at 893 (internal quotation marks omitted).

The Supreme Court has also recently clarified the obligation of a reviewing court to consider the totality of the evidence—and not merely exculpatory facts in isolation—when evaluating a claim of error for its prejudicial effect. In *Wong v. Belmontes*, the Supreme Court stated:

> In evaluating th[e] question [of prejudice], it is necessary to consider *all* the relevant evidence that the jury would have had before it if [the defense] had pursued [a] different path—not just the mitigation evidence [the defense] could have presented, but also the [other] evidence that almost certainly would have come in with it.

130 S. Ct. 383, 386 (2009).[4] On the facts of *Wong*, the defense counsel's failure to introduce certain favorable evidence was not prejudicial to Belmontes because the introduction of that favorable evidence would have "opened the door" to unfavorable evidence, which ultimately outweighed the favorable. *Id.* at 388–89. Likewise, in *Bobby v. Van Hook*, 130 S. Ct. 13, 20 (2009), the Court stated that a reviewing court, when considering a defendant's claim of prejudice, must evaluate the *weight* of mitigating and aggravating evidence regarding the defendant's guilt, rather than simply

---

[4]Although *Wong* is a case about *Strickland* prejudice, it is well settled that "the test for prejudice under *Brady* and *Strickland* is the same." *Avila v. Quarterman*, 560 F.3d 299, 314 (5th Cir. 2009) (internal quotation marks omitted); *see also Jennings v. McDonough*, 490 F.3d 1230, 1243 (11th Cir. 2007); *Snow v. Sirmons*, 474 F.3d 693, 725 n.34 (10th Cir. 2007); *Joseph v. Coyle*, 469 F.3d 441, 462 n.16 (6th Cir. 2006); *Clay v. Bowersox*, 367 F.3d 993, 1000 (8th Cir. 2004). The Supreme Court in *Strickland* acknowledged this, stating that "the appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution." 466 U.S. 668, 694 (1984) (citing *Agurs*, 427 U.S. at 104); *see also Kyles*, 514 U.S. at 436 (noting that the standard for assessing materiality in the context of *Agurs* and *Brady* was "later adopted as the test for prejudice in *Strickland*"). Nevertheless, citing *Strickland*'s deficient-performance prong, the dissent maintains that we have erroneously imported the presumption of reasonableness that applies to claims asserting ineffective assistance of counsel. We have not done so. We have not suggested that *Brady*'s materiality requirement mirrors the analysis of deficient performance under *Strickland*.

tallying instances of mitigation. Guided by these principles, we must determine whether the Ohio Court of Appeals unreasonably applied *Brady* and its progeny in concluding that the undisclosed police report was not material to the outcome of Montgomery's trial.

Montgomery argues that consideration of the content of the police report undermines confidence in his conviction.  The evidence at trial, however, strongly implicated Montgomery as the triggerman in the deaths of Ogle and Tincher.  First, both victims were shot with a .380-caliber pistol that Montgomery bought approximately two weeks before their deaths.  Second, Montgomery's uncle saw Montgomery drunk and in possession of the murder weapon only a few hours before Tincher was found shot dead approximately one-half of a mile from Montgomery's home on March 8.  Third, Montgomery admitted to being at Ogle and Tincher's apartment on March 8, and it is undisputed that Ogle was reported missing sometime shortly after Montgomery's acknowledged visit.  Fourth, Montgomery was wearing a dark blue pin-striped suit jacket during the night in question, and a few hours after Tincher was found dead and Ogle disappeared, Montgomery took a dark blue pin-striped suit to the dry cleaners that was soaking wet and that made a "brownish dripping mess on the floor" as it dried. Fifth, Heard testified that he was with Montgomery and witnessed Montgomery shoot Ogle. Sixth, on the evening of March 12, Montgomery's mother delivered the murder weapon to Officer Marx at a nearby Way-Lo gas station.  Finally, Montgomery showed police officers where Ogle's body was located on March 12.

Given this strong evidence that Montgomery shot Tincher and Ogle, the question is whether the Ohio Court of Appeals unreasonably applied *Brady* in its determination that the withheld police report is not material.  The Ohio court found that the vague police report does not undermine confidence in Montgomery's conviction. The police report stated that in the early morning of March 12, David Ingram and several friends "saw a Blue Ford Escort with Debbie Ogle driving around . . . . Later they again saw her as a passenger in [the] same auto.  Debbie Ogle waved to them as they knew her from Rogers High School.  She was with [a] white male with long side burns.  She did not appear distressed."  Viewed alone, this police report could cast doubt on the State's

theory that Montgomery killed Ogle on March 8. However, when viewed—as *Wong* directs—in the context of all the evidence, including the evidence supporting the State's theory that Montgomery did kill Ogle, the Ohio court was clearly not unreasonable in its determination that the report's nondisclosure does not undermine confidence in the verdict.

It is true, as the dissent notes, that some evidence at trial also tended to implicate Heard. Montgomery and Heard were together on the evening of March 8, and both men visited Ogle and Tincher's apartment. Ogle's wallet was later found in Heard's house, and her abandoned car was recovered nearby. And, Heard's multiple accounts of the murders certainly undermined the credibility of his testimony. The jury was aware of all of this. Although the dissent contends that the undisclosed police report might have tipped the balance in Montgomery's favor by "undermining the strength of an already shaky verdict," we are not persuaded that the report was material to the relevant issue at trial: whether Montgomery or Heard was the triggerman. To the contrary, the report exonerates Heard as Ogle's shooter because he was imprisoned by the time of the alleged sighting on March 12.

In reaching our conclusion that the report was not material under *Brady*, it is worth emphasizing several points. Foremost, Montgomery led police to Ogle's body the *same day* of the alleged sighting described in the police report. At noon on March 12, Montgomery voluntarily sought out the police and admitted to them that both Tincher and Ogle had been killed with his gun, though he stated that Heard had shot them. In other words, mere hours after the alleged sighting of Ogle, Montgomery had already confessed to the police that he had been involved in their murders and that they had been killed with his gun. Moreover, although Montgomery maintained that Heard was the triggerman with respect to both victims, Montgomery's account of events, given to the police on March 12—after the alleged sighting of Ogle but before her body was

found—placed the murder weapon in his hands on the morning of March 8. Finally, the report does not suggest a plausible alternative theory of the case.[5]

Notwithstanding the considerable evidence of his guilt, Montgomery argues that the police report was material to his case under *Brady*. In asserting prejudice, he accords great weight to the argument that the police report could have impeached Heard's testimony and therefore undermined the State's theory of the case. However, with respect to impeachment, this Court has previously remarked: "[W]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material." *Byrd v. Collins*, 209 F.3d 486, 518 (6th Cir. 2000) (quoting *United States v. Avellino*, 136 F.3d 249, 257 (2d Cir. 1998)). In *Bell v. Bell*, for example, we concluded that an informant-witness was sufficiently impeached, and that undisclosed impeachment materials concerning a meeting between that witness and a prosecutor were nonmaterial for *Brady* purposes, where "[t]he jury was apprised of [the informant-witness's] status and the possible other reasons for his decision to testify, namely, that he wished to secure early parole as a result of his participation in the . . . case." 512 F.3d 223, 237 (6th Cir. 2008) (*en banc*). Likewise, in *Brooks*, we found that an "[informant-witness's] credibility was effectively impeached at trial" through evidence that the witness "had an extensive criminal history," was a "professional snitch," and had "received benefits from snitching." 626 F.3d at 893–94. We therefore determined that undisclosed "[e]vidence of his history of mental illness would have provided additional reasons not to credit his testimony, but would have been cumulative to the evidence already in the record." *Id.* at 894; *see also Doan v. Carter*, 548 F.3d 449, 460 (6th Cir.

---

[5]The report does not, for example, suggest that a third party beyond the primary suspects, Montgomery and Heard, committed the crime. Nor does it offer an alternative explanation as to how the murder weapon ultimately ended up in Montgomery's hands. Nevertheless, the dissent suggests without elaboration that "the report sheds light on additional potential defense theories that could have been available to Petitioner." Under *Brady*, however, we must ask whether the undisclosed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. Here, the evidence pointed to only two suspects, Montgomery and Heard, and Montgomery consistently implicated Heard in his statements to the police. We therefore find that the report did not undermine confidence in the verdict based upon an undescribed "additional potential defense theor[y]."

2008) (stating that, "[e]ven if . . . evidence was wrongly withheld by the prosecution," this evidence was cumulative for the purpose of discrediting a witness "because [the witness] had already been impeached on his extensive criminal record and drug problems").

Here, as in *Bell* and *Brooks*, Heard's testimony was amply impeached at trial, during his cross-examination and through the cross-examination of other witnesses, such as Officer Marx. As to Heard's potential motive in testifying, defense counsel emphasized that Heard initially had been charged in the murders of Tincher and Ogle but had pled guilty to complicity to murder and was required to testify against Montgomery pursuant to his plea bargain. Thus, the jury was aware that Heard's testimony had been procured for his own substantial benefit, namely, the opportunity to plead guilty to a lesser charge and receive a concomitantly lower sentence. And, the jury was aware of Heard's significant motive to implicate Montgomery as the triggerman.

At trial, witness testimony also linked Heard to physical evidence in the case: Sergeant Przeslawski testified that Ogle's wallet was found within Heard's dresser drawer and that her car was found near his home. Officer Marx testified that, contrary to Heard's account of Ogle's murder, Heard could not have seen Ogle's body in the field where Montgomery allegedly shot her based upon Heard's position inside the vehicle. Finally, defense counsel highlighted Heard's multiple accounts of the murder, calling into question Heard's credibility. The jury was therefore apprised of Heard's motive, his relationship to the physical evidence, and the potential incredibility of his testimony. Given this extensive impeachment of Heard's account of the murders, the police report is cumulative evidence to the extent that it would further cast doubt upon Heard's testimony. *See Bell*, 512 F.3d at 237.[6]

---

[6]The dissent maintains that the police report was not cumulative for the purpose of impeaching Heard's testimony because it "presents entirely new information, factually unrelated to any of the evidence available to [Montgomery] at the time of his trial." This argument is beside the point. In *Brooks*, we found evidence of an informant-witness's history of mental illness nonmaterial under *Brady*—even though it presented factually new information—because that witness had been "effectively impeached at trial." 626 F.3d at 894. Here, evidence that Ogle was potentially alive on the morning of March 12 could have provided an additional reason to discredit Heard's testimony by undercutting his account of the murders. But, for the reasons we have stated, Heard's credibility as to the facts was already severely undermined by his own multiple accounts of the murders. Thus, the report is cumulative to the extent it further

Furthermore, Montgomery ignores the likely damaging evidence flowing from the report. Most significantly, the report that several witnesses observed Ogle alive at approximately 1:20 a.m. on March 12 undermines the defense theory that Heard, the State's primary witness, was the triggerman. Because it is undisputed that Heard was in custody by March 11, Montgomery's theory is plausible only if Ogle was killed before Heard's arrest. To the contrary, evidence that Ogle was alive on March 12 would remove all suspicion from Heard regarding Ogle's death, destroying Montgomery's defense theory.

It is similarly undisputed that Montgomery's mother, Caroline Jones, telephoned the police station on the afternoon of March 12; arranged to meet Officer Marx at a Way-Lo gas station for the purpose of delivering Montgomery's .380-caliber semi-automatic pistol; and did, in fact, deliver the pistol—which was later confirmed to be the murder weapon—to Officer Marx at approximately 6 p.m. Thus, if Ogle was alive at 1:20 a.m. on March 12, Montgomery must necessarily contend that someone other than Heard had possession of his gun; killed Ogle on March 12 between the hours of 1:20 a.m. and noon, the time at which Montgomery was arrested and stated that Heard killed both women; showed Montgomery the location of Ogle's body before his noontime arrest; and returned the weapon to Montgomery's mother before 6 p.m. Yet, this time line entirely subverts Montgomery's defense theory that Heard was the killer. The defense did not mention any other potential suspects and never suggested that anyone other than Heard possessed Montgomery's .380-caliber pistol.

Montgomery also ignores the fact that any witnesses who testified on his behalf regarding the alleged March 12 sighting of Ogle would have been subject to cross-examination, during which the State could have raised factual contradictions, namely: that Ogle had been reported missing and was the subject of a search since March 8; that her car had been found abandoned on March 9; that her wallet had been recovered from Heard's dresser drawer; and that both Montgomery and Heard had told the police that Ogle had been murdered on March 8. Moreover, the State quite likely could have

impeaches Heard's credibility.

successfully obtained the witnesses' admissions that they had in fact been mistaken about the sighting of Ogle and had instead seen her sister.[7]

Nevertheless, in a final attempt to demonstrate the materiality of the police report, Montgomery directs our attention to the coroner's autopsy report, which lists March 12, 1986, as the date of Ogle's death. However, this date appears to be based merely upon the fact that Ogle's body was found—and thus officially pronounced dead—on March 12, while from March 8 until this date she was officially considered missing. Indeed, although the coroner's verdict report notes that Ogle's body was found on March 12, 1986, it also lists March 8, 1986, as the date of the homicide and gunshot wounds. Thus, coupled with evidence indicating that Ogle was missing from March 8, the coroner's autopsy report neither bolsters Montgomery's argument nor establishes the materiality of the police report with respect to his *Brady* claim.

In reaching our decision, we emphasize that "saying that a particular nondisclosure was not a *Brady* violation in no way suggests that the prosecutor did not have a duty to disclose the information." *Bell*, 512 F.3d at 235 n.7. But, when Montgomery's case is considered both in light of recent Supreme Court precedent in *Wong* and *Van Hook*, and with respect to the totality of the evidence, the State's failure to disclose the police report does not amount to constitutional error because Montgomery has not shown that the evidence would have created a reasonable probability of a different result at either the guilt phase of trial or at sentencing. *See id.* at 236. Consequently, the Ohio courts did not unreasonably apply clearly established federal law by denying Montgomery's *Brady* claim.

---

[7]Although the affidavits attesting that the witnesses actually saw Ogle's sister were not signed until six years after trial, the witnesses had no reason to come forward until the news account about the report appeared. Nothing suggests that they did not recognize their error sooner or would not have recognized it if questioned.

B.

Montgomery also appeals the denial of habeas relief on the following two grounds:  (1) whether the trial court should have disqualified a juror who advised the court that she had been a psychiatric patient and that she had seen the defense psychiatrist in a dream twenty years earlier in which he appeared as the devil; and (2) whether the court should have ordered a change of venue on account of pretrial publicity.  As to these claims, we agree with the district court's reasoning and conclude that the state court neither contravened nor unreasonably applied clearly established federal law in denying Montgomery's requested relief.

1.

First, Montgomery claims that a juror's note to the court disclosing her previous psychiatric treatment and describing her dream about the defense psychiatrist, in which the psychiatrist resembled the devil, demonstrates that she was biased, irrational, and incompetent.  He claims that the trial judge erroneously failed to excuse this juror, thereby violating his Sixth Amendment right to a fair trial by an impartial jury.  When presented with an allegation of bias, the question is "did a juror swear that [s]he could set aside any opinion [s]he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Williams v. Bagley*, 380 F.3d 932, 944 (6th Cir. 2004) (quoting *Patton v. Yount*, 467 U.S. 1025, 1036 (1984)). "A trial court's finding of impartiality is a factual determination entitled to 28 U.S.C. § 2254(e)'s presumption of correctness, and may be overturned only for manifest error." *Id.* (internal citations and quotation marks omitted).

After receiving the note from the juror, the trial judge questioned the juror about her impartiality and competence, and the following colloquy ensued:

> The Court: Okay.  Just let me ask you, would . . . the matter that you have reported to me in the note . . . affect your consideration of the case in such a way . . . that you could not be fair and impartial?
>
> [Juror]: No, not when you use the word effect.
>
> The Court: Would it have any effect?

[Juror]: No because . . . this is in the past, 20 years ago this [dream] happened.

The Court: Okay.  Then would . . . what you have reported to me in this note have any effect on your consideration of the matter that is before the jury now?

[Juror]: No, no.

The Court: Okay, very good.  You'll be taken back to the jury room, then, and the jurors will be instructed to proceed with their deliberations.

As reflected in this dialogue, the trial judge retained the juror only after she reassured him that she could distinguish between her dream and reality, set aside her dream during deliberations, and determine the case solely based on the evidence at trial.  We therefore conclude that the trial judge acted appropriately and that Montgomery has failed to offer clear and convincing evidence that the juror could not or did not remain impartial.

2.

As for the second claim, Montgomery contends that the trial court's denial of his motion to change venue violated his constitutional right to a fair trial in light of extensive pretrial publicity.  However, although this case did involve pretrial publicity, the relevant question in a challenge to the trial court's decision not to change venue is whether the jurors "could not judge impartially the guilt of the defendant."  *Patton v. Yount*, 467 U.S. 1025, 1035 (1984).  The Supreme Court has stated that a "trial court's findings of juror impartiality may be overturned only for manifest error."  *Mu'Min v. Virginia*, 500 U.S. 415, 428 (1991) (internal citations and quotation marks omitted).  Although Montgomery has presented evidence that jurors were *exposed* to pretrial media coverage, he has neither argued nor demonstrated that there was a "pattern of deep and bitter prejudice shown to be present throughout the community," *Irvin v. Dowd*, 366 U.S. 717, 727 (1961) (internal citations and quotation marks omitted), such that the trial court's findings of impartiality were manifest error.  Accordingly, the trial court did not unreasonably apply clearly established federal law in refusing to grant Montgomery's motion to change venue.

C.

In his final argument, Montgomery seeks to expand his Certificate of Appealability ("COA") to include an additional *Brady* claim premised upon the State's alleged withholding of a plea bargain with informant Michael Clark in exchange for his testimony against Montgomery and Heard, and upon the State's subsequent decision not to call Clark as a witness. As described above, the police were first alerted to Heard and Montgomery through a Crime Stoppers tip in which inmate Clark stated that he had received a telephone call from Heard, who reported having seen the murders of two women. However, Montgomery did not assert a *Brady* violation based on withholding this plea information in his habeas petition in the district court; rather, he argued that the State suppressed evidence that there was *no* telephone call between Heard and Clark because the telephone was not turned on at the alleged time of the call. *See Montgomery*, 482 F. Supp. 2d at 974–75. The district court rejected the telephone claim as meritless, finding that there was no evidence as to whether the prison phone was turned on, that the phone was typically on by 9 a.m. on weekends, and that several witnesses stated that Clark had confirmed the call. *Id.* The district court also denied a COA as to the telephone claim because it was not debatable among jurists of reason, as it did not "come[] close to presenting a federal constitutional or legal violation." *Id.* at 1002.

Because Montgomery did not assert a *Brady* claim premised upon the State's plea bargain with Clark in the district court, we do not reach the merits of his request for an expanded COA. His claim is not properly before this court. Indeed, "[i]t is a well-established principle of appellate review that appellate courts do not address claims not properly presented below." *Chandler v. Jones*, 813 F.2d 773, 777 (6th Cir. 1987) (collecting cases); *see also Seymour v. Walker*, 224 F.3d 542, 561 (6th Cir. 2000) ("Although [petitioner] raised these claims in her state postconviction proceeding, she did not raise them before the district court in the present habeas petition, and no certificate of appealability was issued with respect to them. Therefore, we may not consider them.").

IV.

For the foregoing reasons, we reverse the district court's grant of the writ of habeas corpus to Montgomery on the basis of a *Brady* violation and affirm the district court in all other respects.

---

**CONCURRENCE**

---

ALICE M. BATCHELDER, Chief Judge, concurring.  I concur in the majority opinion, and write separately only to address the *Brady* claim.  I think more emphasis needs to be given to the fact that the withheld police report on which Montgomery bases his *Brady* claim could not have helped him at all.  That is, neither the report itself nor the substance of that report could have caused the jury to have a reasonable doubt about the relevant issue here — whether Montgomery, rather than Heard, murdered Ogle.  The police report at issue is simply immaterial to that question.

The only matter that the police report even purports to address is whether at approximately 1:20 a.m. on March 12, 1986, Ogle was already dead.  The *only* evidence that she was not is the statement in that police report that several of her classmates had just seen her, alive and well, as the passenger in a blue Ford Escort, driving through the parking lot of the Oak Hill Apartments where she shared an apartment with Tincher, the other victim.  When that report came in, the police were aware of the great body of evidence that made the report wholly implausible.  Within the next couple of days, the police knew that the report was not only implausible but just plain wrong.

Ogle had not appeared as scheduled for work on the morning of March 8, and her car was first noted that same morning, abandoned on the other side of town.  The police had been exhaustively looking for her since their discovery of Tincher's body and their further discovery that the door to the girls' apartment was unlocked but no one was in the apartment.  By the end of that day, the police had determined that Ogle was missing, and her parents began a series of daily appearances on television, pleading for information about their daughter and for her safe return.

On Sunday morning, March 9, the local newspaper reported Tincher's death.  Also that morning, the police recovered Ogle's abandoned car.  Her apartment keys and purse were in the car, and her car key was in the ignition.  That evening, Ogle's parents made another televised appeal for her safe return.  By Monday, March 10, the police had

begun to fear that, like Tincher, Ogle had been murdered. Detectives continued to question suspects in the Tincher murder and searched a field near the place where Tincher's body had been found, hoping to find evidence that would lead them to Ogle. And Ogle's parents appeared on television again that evening.

On Tuesday, March 11, Michael Clark, an inmate at the Lucas County Jail, told the police that on March 8, Glover Heard had bragged to him about witnessing the murder of two white girls, aged 19 and 20. Another inmate confirmed that Clark had told him about the March 8 conversation with Heard, and two corrections officers further confirmed the story. The police began to look for Heard while continuing an intensive search for Ogle. They did not find Ogle, but they did find Heard, and by 2:30 p.m. on March 11, Heard was in police custody. By 3:30 p.m., Heard's alibi witness had implicated Montgomery and police went to look for him. At 4:35 p.m., Heard was formally arrested and booked for Tincher's murder; he was transferred to the Lucas County Jail where he remained for all times relevant to this case. That evening, about 7:00 p.m., Montgomery's mother consented to a police search of her residence — police found a black, hooded jacket (consistent with witness descriptions) and a manual for a .38 caliber handgun (consistent with the gun used to kill Tincher). Later that night, at about 12:30 a.m. on March 12, police executed a warrant to search Heard's residence and found Ogle's wallet, driver's license, and credit cards.

By 1:20 a.m. on March 12, when the police received the call from David Ingram that he and several friends had seen Ogle driving around in the Ford Escort, Ogle's status as a missing person had been in the newspapers and on television for three days. Had Ogle been in the vicinity, she could hardly have escaped the knowledge that her roommate had been murdered and that she herself was the object of an intensive and very public search. But no one had heard a word from her. She had abandoned her job, her boyfriend, and her family without a single word. She had also abandoned her apartment, her car, and her wallet, including her driver's license and credit cards.

By 11:30 p.m. on March 12, when Montgomery finally led them to Ogle's body, he had given the police several versions of the events of March 8, including that Heard

had admitted to killing both girls on the morning of March 8; that Montgomery did not know where Ogle's body was; that Heard had killed the girls using Montgomery's gun; and that the body was "on Hill Avenue near a market." Directed by Montgomery, the police found the body in a wooded area near 4700 Hill Avenue. The following day, the Lucas County Coroner performed an autopsy, noting in the report that the gunshot wound that had caused Ogle's death had been inflicted on March 8. The coroner also told the newspaper that Tincher and Ogle had likely died the same day (Saturday, March 8), but that it "may not be possible to determine [Ogle's] precise time of death."

To establish a *Brady v. Maryland*, 373 U.S. 83 (1963), violation "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [prosecution], either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 282 (1999). A showing of prejudice need not mean that the evidence would have led to an acquittal, but merely "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

Here, there is no reasonable probability that the withheld police report would have made any difference whatsoever in the course or outcome of Montgomery's trial. The report itself is inadmissible hearsay, as even the now-vacated majority panel opinion conceded. And if Montgomery had called as witnesses David Ingram or any of the individuals who were with him when he reported seeing Ogle in the Ford Escort, there is no basis upon which to claim that they would have stood behind that report. They, in fact, realized that same night that they had seen Ogle's sister and not Ogle riding around in the Escort, and they recanted the report when they learned years later that it had been the basis for granting habeas relief to Montgomery. But even if we were to assume that the report could have been utilized at trial, and that it would have been unrefuted, we cannot proceed to the assumption that it could have helped Montgomery in any way.

First, the report had Ogle still alive in the wee hours of March 12, 1986. Heard was in police custody at that time, and he remained in custody throughout that entire day and for a long time thereafter. Montgomery's claim is, and always has been, that it was Heard who murdered Ogle and Tincher, not Montgomery. Heard, on the other hand, pled guilty to his role in the murders and gave the police a detailed account of the events leading up to the murders and the murders themselves. That is, Ogle could only have been alive and well on March 12 if Heard had fabricated his part in the murders, falsely confessed, and inexplicably accepted a prison term of 15 years to life.

And there has never been any serious claim that anyone other than Montgomery or Heard was the killer. Rather, Montgomery and Heard agree entirely that one of the two of them shot both girls. The point of disagreement is which of them did so, and as to that, each of them simply points to the other. So if Ogle was not murdered until after 1:20 a.m. on March 12, for Heard to have done it, he would have had to commit the murder from his jail cell. Not likely. And if Heard could not have murdered Ogle on March 12, between 1:20 a.m. and 11:30 p.m. when Montgomery led the police to her body, then that leaves Montgomery to have done it. All of this begs the question, "How would using the information in the withheld police report, either as direct evidence or to impeach Heard's testimony, have helped Montgomery?" The answer, of course, is "It wouldn't."

Second, there is simply no basis for the dissent's suggestion that if he had known about the report, Montgomery might have been able to construct "additional potential defense theories." With or without the report, such theories would have been constructed out of whole cloth. Heard's version of the murders was that he and Montgomery went to the girls' apartment early in the morning on March 8; they departed with Ogle shortly thereafter; they drove around for a bit before going to a field near the apartment; Montgomery ordered Ogle to park her car and get out; Montgomery took Ogle across the field and into the woods; Montgomery shot Ogle; Montgomery and Heard then left the scene in Ogle's car and went back to the girls' apartment; Montgomery went into the apartment; Heard took Ogle's car and drove it some five

miles to a location about a block from where he lived and abandoned it, taking her wallet and credit cards but leaving her purse and keys in the car. According to Heard, Montgomery persuaded Tincher to leave the apartment with him in Tincher's car; Tincher drove a couple of miles to Angola Road and pulled over; Montgomery shot her in the head and killed her; Montgomery then fled the car on foot and went to his apartment about a quarter of a mile away. Despite numerous problems with Heard's version of the murders — lack of motive, discrepancies between the eyewitnesses' description of what the man seen fleeing Tincher's car was wearing and what Montgomery was wearing, to name just a couple — what is important is that Heard sat on the witness stand and told the jury than he and Montgomery had committed the murders, that he had accepted punishment for his role, and that Montgomery had been the shooter.

During extensive police questioning, Montgomery never mentioned anyone else who might have been involved, or that Ogle might have been killed some time other than the morning of March 8. According to Montgomery, Heard had possession of Montgomery's gun that morning because Montgomery was afraid of being checked by police. Heard and Montgomery went to Ogle's apartment and got Ogle so she could drop them at Montgomery's on her way to work. Montgomery says she dropped him off at his apartment; that Heard asked to keep the gun, but gave no reason, and Montgomery agreed; that Heard and Ogle left Montgomery's apartment; that some time later, Heard came back to Montgomery's apartment and told Montgomery that he had killed Ogle; and Heard either showed or described to Montgomery the location of Ogle's body. Montgomery says that Heard convinced him to go back to the girls' apartment and persuade Tincher – who did not know Heard as well as she knew Montgomery – to come with them; that he did so; and that Heard and Tincher left the apartment in Tincher's car and Montgomery left in Heard's mother's car, heading home. Heard rode with Tincher to the Angola Road location, shot her in the head, and ran across the field to Montgomery's apartment, where he gave the gun back to Montgomery; Heard took his mother's car and returned home; and Montgomery hid the gun.

It is beyond dispute that, upon his arrest at approximately noon on March 12, Montgomery knew the location of both the murder weapon and Ogle's body. During a telephone conversation, while in custody, Montgomery directed his mother to the location of the hidden gun — she eventually retrieved it and delivered it to the police. And after protesting for hours that he did not know the location of the body, Montgomery eventually relented and led the police directly to it.

There are numerous holes and inconsistencies in the stories of both Heard and Montgomery. And there is overwhelming evidence that both Tincher and Ogle were murdered on the morning of Saturday, March 8. Moreover, the evidence is uncontroverted that Heard or Montgomery (or both) murdered Tincher and Ogle. There is not anywhere in this record any basis for theorizing that some third party happened on the scene and murdered these two girls, or, for that matter, any other "potential defense[s]" for Montgomery, no matter when Ogle died. All of this begs the question, "Why did Montgomery need to know about the police report in order to come up with some 'additional potential defense theories'?" The dissent posits no answer to this question, but I suggest the answer is "He didn't."

The issue before us with regard to this *Brady* claim is whether, using the standard that we are required to use under AEDPA, and particularly as that standard has been most recently elucidated in *Harrington v. Richter*, 131 S. Ct. 770 (2011), we can say that the Ohio Court of Appeals unreasonably concluded that the withheld police report did not undermine confidence in the outcome of the trial. It is important to emphasize that a state court's application of Supreme Court precedent cannot be unreasonable — nor can the state court's determination of the facts be unreasonable — simply because it is not based on speculation about the possible benefit to the habeas petitioner had the jury been able to consider an isolated piece of information that was overwhelmingly demonstrated by the evidence to be false. The Ohio Court of Appeals neither unreasonably applied *Brady*, nor unreasonably determined the facts in light of the evidence before it.

---

**CONCURRING IN THE JUDGMENT**

---

HELENE N. WHITE, Circuit Judge (concurring in the judgment).  I join in the dissenting opinions' explications of the *Brady* standard and their emphasis on the need to keep the standards for showing prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984), and *Brady v. Maryland*, 373 U.S. 83 (1963), distinct.  I also agree that the evidence of Montgomery's guilt was not overwhelming, and that the evidence points equally (if not more) to Heard's being the killer.  Nevertheless, I cannot conclude that the Ohio Court of Appeals unreasonably applied clearly established Supreme Court precedent in determining that the improperly withheld evidence was not material within the meaning of *Brady*.

The Ohio Court of Appeals recited the correct standard for prejudice under *Brady*.  *See State v. Montgomery*, No. L-98-1026, 1999 WL 55852, at *7 (Ohio Ct. App. Feb. 5, 1999).  It then stated:

> The lower court concluded that this isolated information [in the withheld police report], recorded in the course of an ongoing investigation when all of the facts were still being pieced together and in the face of overwhelming evidence presented at trial that Ogle had been killed on March 8, 1986, did not undermine confidence in the outcome of the trial. We agree and conclude that the trial court did not err in dismissing [this] claim for relief.

*Id.* at *8.

Normally, one would think that withholding a report describing a sighting of the deceased victim before her body was found but after the defendant allegedly committed the crime would be enough to "undermine confidence in the outcome" of the trial.  *See Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *United States v. Bagley*, 473 U.S. 667, 682 (1985).  But here, where Montgomery led police to Ogle's body within hours after the alleged sighting described in the police report; where the evidence indicates that Ogle was missing from March 8, 1986, and was likely killed that day; where Montgomery's

own account of events, given to police after Ogle was allegedly sighted and before Montgomery led police to her body, placed the murder weapon back in his possession on the morning of March 8, before the alleged sighting; and where the withheld police report does not suggest a plausible alternative theory of the case, I conclude that the Ohio Court of Appeals reasonably determined that the improperly withheld evidence was not material. Importantly, the withheld evidence was not material to the real issue at trial — whether it was Montgomery or Heard who actually killed Ogle. And, to the extent Montgomery argues that disclosure of the report would have allowed him to investigate and develop another defense, such a defense would be so inconsistent with all the evidence, including Montgomery's statements, that it is reasonable to conclude that it would have had little chance of affecting the outcome of the trial.

Looking at the totality of the evidence presented to the jury, the Ohio court reasonably concluded that disclosure of the police report would not have created a "reasonable probability of a different result" and did not "undermine confidence in the outcome." *See Kyles*, 514 U.S. at 434 (internal quotation marks omitted). Given the confines of our review under AEDPA, 28 U.S.C. § 2254(d), the state court's decision must be upheld.

————————

**DISSENT**

————————

MERRITT, Circuit Judge, dissenting.  The majority in this case conflates the standard applicable for materiality in *Brady* claims with the standard for prejudice in *Strickland* claims, in order to import the prosecution-friendly presumptions of regularity applicable to the latter.  In so doing, it guts the *Brady* rule of any practical deterrent effect in all but the most unconscionably severe cases.  It provides a disincentive for prosecutors to comply with the law.  It has selected a particular inappropriate case for this doctrinal shift because it should not agree with the state court's view that it was reasonable for the prosecutor to conceal the Ogle facts "in the face of overwhelming evidence presented at trial" that Montgomery killed Ogle on March 8, 1986.  The evidence was not "overwhelming," and the concealment was not reasonable.  There is no way to know what the outcome of this would have been had the Ogle report been turned over to the defense promptly during the defense investigation, rather than concealed.  I, therefore, respectfully dissent.

The withheld evidence in this case, as the District Court found, is a police report indicating that witnesses saw the victim, Debra Ogle, alive on March 12, 1986, four days after the prosecutor claimed, and the jury ultimately found, that William Montgomery, not Grover Heard, killed her.  That evidence is clearly exculpatory and should not have been concealed by the prosecutor for six years until post-conviction counsel found it by accident in a group of documents obtained under Ohio's version of the Freedom of Information Act.  In a case of blatant prosecutorial misconduct, no one has seriously contested the fact that the prosecutor suppressed the evidence simply because it was inconsistent with his theory of the case.  The District Court concluded that the case should be retried in state court.  We should not retry it here on appeal, as my colleagues suggest.  Montgomery is entitled to a jury trial free of gross prosecutorial misconduct.

My colleagues in the majority, citing a series of ineffective assistance of counsel cases, make it clear that in their opinion the constitutional test for this textbook *Brady*

violation is the same as in an ineffective assistance of counsel case. Beginning with *Strickland v. Washington*, 466 U.S. 668 (1984), the majority says that "guided by these principles [of the ineffective assistance of counsel cases] we must determine whether the Ohio courts unreasonably applied *Brady . . . .*" In a nutshell, the majority's error is that it adopts not the *Brady* principle's strict rule but the more prosecution-friendly standard of *Strickland*, with its presumption of trial regularity. The majority is confusing two separate and distinct constitutional violations — a claim under the Sixth Amendment concerning the conduct of counsel for the defense, and a clear, bright-line rule of Due Process prohibiting counsel for the prosecution from concealing exculpatory evidence. On the one hand, *Strickland* requires a "strong presumption" in favor of the state that no irregularity took place. *Harrington v. Richter*, 131 S. Ct. 770, 787 (Jan. 19, 2011) ("A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance.") (quoting *Strickland*, 466 U.S. at 689). The *Strickland-Richter* language says that "the standard for judging counsel's representation is a most deferential one" *Richter*, 131 S. Ct. at 788.

Contrast this with the latest *Brady* case from the Supreme Court, *Connick v. Thompson*, 131 S. Ct. 1350 (Mar. 29, 2011). The majority in that case, relying on the ABA Model Rules of Professional Conduct, said that:

> Among prosecutors' unique ethical obligations is the duty to produce *Brady* evidence to the defense. An attorney who violates his or her ethical obligations is subject to professional discipline, including sanctions, suspension, and disbarment. . . . Prosecutors are not only equipped but also ethically bound to know what *Brady* entails and to perform legal research when they are uncertain.

*Id.* at 1362-63 (internal citations omitted). The Court then quotes from one state's code of professional responsibility that distinguishes between the strict requirements for prosecutors and the quite different responsibility for private lawyers:

> With respect to evidence and witnesses, the prosecutor has responsibilities different from those of a lawyer in private practice: the prosecutor should make timely disclosure to the defense of available

evidence, known to him, that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment. Further, a prosecutor should not intentionally avoid pursuit of evidence merely because he believes it will damage the prosecution's case or aid the accused.

*Id.* at 1362 n.8. The dissent in *Connick* agrees that *Brady* is a binding rule that is "among the most basic safeguards" of a "criminal defendant's fair trial right." *Id.* at 1385 (Ginsburg, J., dissenting) (citing *Cone v. Bell*, 129 S. Ct. 1769, 1772 (2009)).

Thus, the majority in the instant case started its analysis by following a set of presumptions and vague standards favoring the state. *Strickland* instructs us to presume the absence of irregularity in the trial, but *Brady* — flatly forbidding the refusal to turn over information favorable to the defendant — teaches that the withholding of evidence is itself a grave irregularity. It is not only a legal requirement but a "unique ethical obligation," a moral duty unlike any of the duties imposed by *Strickland*.

In short, as to the test for the materiality of exculpatory evidence, the vocabulary of the law is not and should not be the same as for ineffective assistance of counsel, as my colleagues say they believe. This is because the concealment of evidence is the fault of the state, not the defendant's side of the case, as with ineffective assistance of counsel where the presumption of regularity is with the state and against the defendant. For this reason, and because there is no other significant deterrent to prosecutorial misconduct of this type — which is widespread[1] — there should not be a presumption of trial regularity when it is discovered that exculpatory evidence has been withheld; if anything, there should be a fairly strong inference of materiality that the prosecution

---

[1]There are a plethora of law review articles and symposia recounting the widespread nature of the prosecutorial malfeasance problem. *See, e.g.*, Stephanos Bibas, *Prosecutorial Regulation Versus Prosecutorial Accountability*, 157 U. Pa. L. Rev. 959 (2009); Charles Ogletree, *Judging Justly? Judicial Responsibility for Addressing Incompetent Counsel and Prosecutorial Misconduct in Death Penalty Cases*, 20 T.M. Cooley L. Rev. 21 (2003); Welsh White, *Curbing Prosecutorial Misconduct in Capital Cases*, 39 Am. Crim. L. Rev. 1147 (2002); Fred C. Zacharias, *The Professional Discipline of Prosecutors*, 79 N.C. L. Rev. 721 (2001); Lyn M. Morton, Note, *Seeking the Elusive Remedy for Prosecutorial Misconduct: Suppression, Dismssal, or Discipline?*, 7 Geo. J. Legal Ethics 1083 (1994); Richard A. Rosen, *Disciplinary Sanctions Against Prosecutors for* Brady *Violations: A Paper Tiger*, 65 N.C. L. Rev. 693 (1987); *see also* Erwin Chemerinsky, *Head in the Sand Over Prosecutorial Misconduct*, National Law Journal, Apr. 25, 2011, *available at* http://www.law.com/jsp/nlj/PubArticlePrinterFriendlyNLJ.jsp?id=1202491215314 (noting that "[s]tudy after study has demonstrated serious prosecutorial misconduct at both the federal and state levels").

should have to overcome. If, as the Supreme Court states, prosecutors are bound to know and follow the *Brady* rule, and in fact do know its meaning, and even so they then conceal the exculpatory evidence from the defendant, the inference should be that they concealed it because they believed it would hurt their case. This fact should normally lead to a rebuttable presumption that the trial did not result "in a verdict worthy of confidence" — the test for materiality that applies to violations of the *Brady* rule, as set out in *Kyles v. Whitley*, 514 U.S. 419, 434 (1995), and repeated in *Strickler v. Greene*, 527 U.S. 263, 290 (1999) (the question is whether the evidence puts the case "in such a different light [so] as to undermine confidence in the verdict"). As the Supreme Court has explained, the "probability of a different verdict," as required by the majority in this case, is not the bottom line standard in *Brady* cases. *See Strickler*, 527 U.S. at 289-90 ("The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." (internal citations omitted)).

The majority claims that when it says that it is following the principles of *Strickland* in deciding this *Brady* case, it does not mean to follow *Strickland's* general presumption of reasonableness on the part of counsel. (Opinion, footnote 5.) But the majority's failure to recognize and condemn the prosecutor's obvious disregard of the *Brady* rule suggests a predisposition to find prosecutorial reasonableness in the face of prosecutorial misconduct. This predisposition to discount prosecutorial wrongdoing is like the presumption of reasonableness employed in *Strickland*. Instead, the court should assume that the prosecutor concealed the exculpatory information because he believed the jury verdict might well be different if it heard the undisclosed evidence. In a *Brady* case of concealed, exculpatory evidence, *Strickland's* presumption of reasonableness should become a presumption of unreasonableness. We should not use *Strickland's* principles as a guide to deciding the standards to be followed in a *Brady* case.

While what remains of *Brady* after this case is difficult to discern, the message sent by this case to prosecutors in our Circuit is crystal clear: where a spin can be put

on the available evidence against a defendant that the evidence is "overwhelming," feel free to withhold evidence.  It turns the jury trial from a search for the truth *before* administering retributive justice into a search for an excuse for prosecutorial misconduct *after* the jury trial is over.  After all, even assuming that down the line the defendant somehow contrives, from within  prison walls, to obtain the withheld evidence, he must overcome the presumption that his trial, absent the withheld exculpatory evidence, was nonetheless fair.  This should prove impossible in all but the most egregious *Brady* cases, and the deterrent effect of *Brady* against prosecutorial malfeasance of this sort will be practically eliminated.  Because of the importance of the *Brady* rule, because of the fact that it is a rule, not a set of vague standards or admonitions, and because of the need for real deterrence of such prosecutorial concealment and the widespread nature of the problem, the courts should not follow the lead of the majority in making the problem worse and more widespread.

And finally, I would point out that the majority's characterization of the facts only serves to enhance the artificial presumption of this trial's regularity.  The majority offers six reasons why the evidence that "Montgomery shot Tincher and Ogle" was "overwhelming," but none suffice definitively to establish Montgomery's guilt, particularly to the exclusion of Glover Heard.  Montgomery may have bought the murder weapon, but both men had access to it on the night in question.  Both were seen by Montgomery's uncle hours before the crime.  Both admitted being at the girls' apartment on March 8.  Montgomery's dripping jacket — which, incidentally, tested negative for the presence of blood — does not by itself "overwhelming[ly]" prove that he as opposed to Heard pulled the trigger.  Montgomery may have ended up with the murder weapon, but so too did Heard end up with the fruits of this alleged robbery.  Pursuant to a plea deal, Heard testified that he witnessed Montgomery shoot Ogle, but a detective testifying for the state recalled telling Heard he physically could not have seen this take place from the position Heard claimed to be within Ogle's parked car.  Montgomery showed police officers where Ogle's body was, but consistently maintained that he only knew the body's location because Heard told him.

In sum, apart from Heard's implausible testimony, the case against Montgomery was entirely circumstantial. Montgomery had no motive at all — indeed, the prosecution at times candidly conceded this fact, when not at other times inviting unsubstantiated and racially charged speculation that this African-American defendant may have had some sort of sexual interest in one of these white female victims. But his trial counsel put on no defense, relying instead only on the cross-examination of the state's witnesses. Much of the defense's closing argument was concerned with effectively apologizing for not putting up a defense, and desperately admonishing the jury not to hold that fact against Montgomery. One can only wonder whether, had his counsel known of the existence of some affirmatively exculpatory evidence, such as the testimony of witnesses who saw Ogle days after the prosecution claimed she was murdered — and perhaps combined it with other evidence, such as the coroner's report stating that Ogle died on the day she was allegedly seen, not days before — a different result might have obtained in this case. We will never know, because the state made sure that did not happen. With that uncertainty in place, I cannot say that the jury's verdict in this case is worthy of confidence, and so I would find the withheld evidence material, and affirm the granting of the writ by the District Court.

———————————

**DISSENT**

———————————

BOYCE F. MARTIN, JR., Circuit Judge, dissenting.  I agree totally with Judge Merritt's dissent.  The violation of *Brady* does not create an ineffective assistance of counsel claim, but is a violation of the constitutional protection for a fair trial.

-------------------

**DISSENT**

-------------------

CLAY, Circuit Judge, dissenting.  This case presents our Court with the question of whether certain exculpatory evidence, which we all agree was improperly kept from Petitioner's defense team, is material to Petitioner's culpability or punishment and can serve as the basis of a violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  The majority's conclusion that the state court did not unreasonably apply clearly established federal law in finding that the evidence is not material is flawed in three principal ways:  first, the majority misstates the legal standard for demonstrating *Brady* materiality; second, in its materiality analysis, the majority mischaracterizes the factual record in this case; and third, principally because of these two problems, the majority performs a faulty prejudice analysis, and incorrectly finds that the state court reasonably held that the suppressed evidence is not material under *Brady v. Maryland*.  I therefore respectfully dissent.

**STATEMENT OF FACTS**

Petitioner William T. Montgomery was sentenced to death for the aggravated murder of Debra Ogle, and sentenced to a term of years for the murder of Cynthia Tincher.  This habeas proceeding concerns a single piece of evidence that the prosecution failed to disclose, namely a police report indicating that several witnesses saw Ogle alive four days after the March 8, 1986 murders purportedly took place (the "report").  The district court found the report material, and granted Petitioner's petition for a writ of habeas corpus, stating that "sufficient weaknesses exist . . . in the State's case, that [it] could have been undermined by the withheld police report." *Montgomery v. Bagley*, 482 F. Supp. 2d 919, 977 (N.D. Ohio 2007).  The district court elaborated that "the State's case was not airtight and that it could have been undermined by sufficient contradictory evidence."  *Id*. at 976.  We are charged with evaluating whether the suppressed report was in fact material, entitling Petitioner to a writ of habeas corpus.

The majority adequately recites the basic facts of this case, and it is unnecessary to repeat those here. Rather, my description of the facts will be limited to those insufficiently developed by the majority, and will be interspersed throughout the analysis.

**DISCUSSION**

**I.     Legal Framework**

**a.     *Brady v. Maryland***

The Supreme Court held in *Brady* "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (quoting *Brady*, 373 U.S. at 87). Thus, to establish a *Brady* violation, Petitioner must demonstrate that the evidence in question: (1) is "favorable to the accused, either because it is exculpatory, or because it is impeaching;"(2) was "suppressed by the State, either willfully or inadvertently;" and (3) was "material." *Id*. at 281-82. Because in this case the Respondent concedes that the report was exculpatory, and that the state suppressed it, the report's materiality is the only issue in the instant appeal.

The Supreme Court has explained that

> favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different . . . . [A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted in the defendant's acquittal.

*Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995); *see also Strickler*, 527 U.S. at 280. In so explaining, the Supreme Court reasoned that the

> touchstone of materiality is a "reasonable probability" of a different result, and that adjective is important. The question is not whether [a] defendant would more likely than not have received a different verdict

with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial.

*Id*. at 434 (internal quotations and citations omitted).

Furthermore, the Supreme Court indicated that "[o]ne does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id*. at 435. We have similarly reiterated that "[t]he question [for *Brady* materiality is] not whether it [is] likely that [the defendant's] conviction would be overturned in light of newly discovered evidence." *Jamison v. Collins*, 291 F.3d 380, 388-89 (6th Cir. 2002). Therefore, in assessing materiality under *Brady*, we consider "the withheld information . . . in light of the evidence available for trial that supports the petitioner's conviction." *Jells v. Mitchell*, 538 F.3d 478, 502 (6th Cir. 2008).

Nevertheless, the test for *Brady* materiality "is not a sufficiency of evidence test." *Kyles*, 514 U.S. at 434. As the Supreme Court explained,

A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

*Id*. at 434-35. The Supreme Court has thus clarified that *Brady* materiality is not a strictly quantitative inquiry. Rather, it is more of a qualitative inquiry in which a reviewing court must ask whether the suppressed evidence casts sufficient doubt on a petitioner's conviction that it puts the case in "a different light." *Id*. at 435.

The relevant question for the instant *Brady* materiality analysis, therefore, is not whether the report necessarily exculpates Petitioner, or discounts so much of the incriminating evidence that Petitioner's conviction beyond a reasonable doubt cannot stand; rather, it is whether, after considering the relative strength and relevance of the inculpatory and exculpatory evidence, including the report, Petitioner's conviction is "worthy of confidence." *Jells*, 538 F.3d at 502 (quoting *Kyles*, 514 U.S. at 434).

### b.      Standard of Review

Petitioner filed his petition for a writ of habeas corpus in 2000, after the April 24, 1996 effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA") amendments to 28 U.S.C. § 2254. Thus, because we are reviewing Petitioner's *Brady* materiality claim in the context of his petition for a writ of habeas corpus, this case does not turn on a direct application of the *Brady* materiality standard. Rather, we must evaluate the state court's application of *Brady* to Petitioner's case through AEDPA's deferential lens. Our disposition of Petitioner's habeas claim hinges on the interplay between *Brady* and AEDPA.

As amended, section 2254(d) states:

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A decision is "contrary to . . . clearly established federal law" pursuant to § 2254(d)(1) if "the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006) (quoting *Williams v. Taylor*,

529 U.S. 362, 413 (2000)).   A state court decision "involve[s] an unreasonable application of clearly established federal law" pursuant to § 2254(d)(1) if

> the state court identifies the correct governing legal principle but unreasonably applies that principle to the facts of the prisoner's case. Clearly established Federal law, as determined by the Supreme Court of the United States, refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision.

*Id*. at 763 (quoting *Williams*, 529 U.S. at 412).

The Supreme Court recently decided a series of cases clarifying AEDPA's contours.  *See, e.g., Cullen v. Pinholster*, 563 U.S. __, 131 S. Ct. 1388, 1398 (2011); *Harrington v. Richter*, 562 U.S. __, 131 S. Ct. 770, 787 (2011); *Premo v. Moore*, 562 U.S. __, 131 S. Ct. 733, 739 (2011); *Renico v. Lett*, 559 U.S. __, 130 S. Ct. 1855, 1862 (2010).  This case is the first opportunity our en banc Court has had to apply AEDPA subsequent to the Supreme Court's most recent decisions.  In these cases, the Court explained that while AEDPA always requires habeas courts to accord state court decisions significant deference, the nature of the deference is tailored to the legal rule underlying the habeas claim.  *See Harrington*, 131 S. Ct. at 786.  ("Evaluating whether a rule application [by a state court] was unreasonable requires considering the rule's specificity.   The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").

These cases dealt with application of general rules, specifically, evaluating whether counsel provided ineffective assistance, and determining whether the trial court properly declared a mistrial.  *See, e.g.*, *Cullen*, 131 S. Ct. at 1403; *Harrington*, 131 S. Ct. at 788 ("[t]he *Strickland* standard is a general one, so the range of reasonable applications is substantial"); *Premo*, 131 S. Ct. at 740; *see also Renico*, 130 S. Ct. at 1865 ("the standard applied . . . [namely,] whether the [trial] judge exercised sound discretion [in declaring a mistrial] – is a general one, to which there is no plainly correct or incorrect answer in this case").  A habeas court considering alleged violations of those general rules is reviewing two layers of discretionary action: (1) those of the initial actor

– either counsel, or the state trial court; and (2) the state court's evaluation of the constitutional reasonableness of that conduct. *See, e.g., id.* at 1864.

Although the Supreme Court has not had occasion to describe AEDPA's application in the *Brady* context at issue in this case, by considering *Brady* with reference to the legal rules which the Supreme Court has reviewed under AEDPA, we can extrapolate how to apply AEDPA in the *Brady* context.

In contrast to the circumstances in which the Supreme Court recently applied AEDPA, *Brady* is a narrow rule that mandates specific compliance with its requirements, and does not involve discretion in its implementation. *Brady* requires that a reviewing court reverse a conviction or sentence if a prosecutor suppresses exculpatory or impeachment evidence that is material to a defendant's guilt or sentence. *See Strickler*, 527 U.S. at 280; *Brady*, 373 U.S. at 87. Assessing whether a *Brady* violation entitles a petitioner to relief does not involve a discretionary inquiry with multiple correct answers. Rather, it involves a legal determination that considers the totality of a case's facts with reference to the excluded evidence in order to determine whether that evidence "undermines confidence in the outcome of the trial." *Kyles*, 514 U.S. at 434. The *Brady* standard thus affords state actors little leeway in its implementation, and cases with multiple correct answers, and multiple reasonable conclusions are bound to be far less common in the context of *Brady* materiality than in cases assessing discretionary action. *See, e.g.*, *Cullen*, 131 S. Ct. at 1407. Therefore, because the narrowness of *Brady* circumscribes state actors' legitimate range of reasonable choices, as compared to discretionary state determinations, state actions implicating *Brady* are subject to relatively less deference on habeas review. *See Harrington*, 131 S. Ct. at 786 (stating that "[t]he more general the rule, the more leeway [state] courts have in reaching outcomes in case-by-case determinations," and explaining that this discretion is accorded a commensurate amount of deference on habeas review).

The nuances of our *Brady* analysis under AEDPA are guided by the recent Supreme Court cases highlighting AEDPA's important role as "part of the basic structure of federal habeas jurisdiction, designed to confirm that state courts are the

principal forum for asserting constitutional challenges to state convictions." *Harrington*, 131 S. Ct. at 787; *see also Cullen*, 131 S. Ct. at 1398; *Walker*, 131 S. Ct. at 1120; *Premo*, 131 S. Ct. at 733; *Renico*, 130 S. Ct. at 1855. The AEDPA standard "is a difficult to meet, and highly deferential standard for evaluating [state court] rulings, which demands that [state court] decisions be given the benefit of the doubt." *Cullen*, 131 S. Ct. at 1398 (internal quotations and citations omitted). The Supreme Court has thus reiterated that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington*, 131 S. Ct. at 786.

Nonetheless, AEDPA does not foreclose federal habeas review of state court convictions and sentences. As the Supreme Court emphasized, AEDPA "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Id.* Rather, federal habeas review continues to serve the important role of "guard[ing] against extreme malfunctions in the state criminal justice systems," *id.*, and in its recent decisions the Supreme Court counseled us regarding the precise mechanics of AEDPA deference.

These cases explicating AEDPA yield several principles that guide our application of AEDPA deference to Petitioner's claim. First, the Supreme Court stressed that a federal court must accord AEDPA deference to all state court adjudication of a claim, even those disposed of by an unexplained summary order. In according a summary order the requisite AEDPA deference, a federal court must review the case to ensure that no reasonable legal argument exists in support of the state court's decision. In so doing, the habeas court must carefully examine the case's factual record in its entirety, taking care not to overlook any reasonable justifications for the state court's decision. *See id.* at 789-91. Second, the habeas court must not apply undue hindsight to the case, *see Premo*, 131 S. Ct. at 745, but must analyze the habeas claims from a contemporaneous perspective. *See Harrington*, 131 S. Ct. at 789.

Application of these AEDPA principles must be tailored to a case's legal context, and further tailored to a case's factual context. *See id.* at 786; *Renico*, 130 S. Ct. at 1864.

The degree of deference mandated by AEDPA varies depending on the degree of legitimate discretion involved in the conduct under review. "When assessing whether a state court's application of federal law is unreasonable, the range of reasonable judgment can depend in part on the nature of the relevant rule that the state court must apply." *Renico*, 130 S. Ct. at 1864. The more discretion possessed by the actor whose conduct is under review on habeas, the more deference a federal habeas court must accord the decision under AEDPA. Furthermore, "[b]ecause AEDPA authorizes federal courts to grant relief only when state courts act unreasonably, it follows that the more general the rule at issue – and the greater the potential for reasonable disagreement among fair-minded judges – the more leeway state courts have in reaching outcomes in case-by-case determinations." *Id.* (internal quotations, citations and emphasis omitted). Therefore, under AEDPA, "[e]valuating whether a rule application [by a state supreme court] was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Harrington*, 131 S. Ct. at 786; *see also Renico*, 130 S. Ct. at 1864.

*Renico*, *Harrington*, *Premo*, and *Cullen* all applied general rules that accorded the actors under review significant discretion. *Renico* considered whether the state court unreasonably applied the double jeopardy clause in finding that the trial court did not abuse its discretion in granting a mistrial. The Supreme Court explained that the standard for determining "whether the judge exercised sound discretion [in declaring a mistrial] – is a general one, to which there is no plainly correct or incorrect answer." *Renico*, 130 S. Ct. at 1865. *Harrington*, *Premo*, and *Cullen* all evaluated habeas petitions claiming ineffective assistance of trial counsel, and all turned on whether the state court unreasonably applied *Strickland* in determining that counsel's representation did not fall below an objective standards of reasonableness. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). In analyzing the reasonableness of counsel's conduct, the Court highlighted that "[t]he *Strickland* standard is a general one . . . [and] the range of reasonable applications is substantial." *Harrington*, 131 S. Ct. at 788 ("There are . . . countless ways to provide effective assistance in any given case."). Thus, in deciding habeas petitions based on the trial court's declaration of a mistrial, and

whether counsel's performance was deficient, in addition to the deference it accorded the state court, the Supreme Court accorded the trial court and counsel significant deference, corresponding to their significant discretion in determining their courses of action. *See, e.g., id*. at 786-88.

The standards discussed above are general ones that afforded the actors significant discretion, and could be satisfied through a range of potentially divergent conduct. In contrast, the *Brady* standard at issue in our case constitutes a narrow rule that mandates specific compliance from prosecutors. The AEDPA deference accorded the state determinations in *Brady* cases is thus dissimilar from the AEDPA deference accorded in *Renico*, *Harrington*, *Premo*, and *Cullen*. First, whereas those cases called for a double layer of deference, in the instant case, only a single layer of deference to the state court's decision is required. Second, those cases involved general rules that could be reasonably applied in several divergent ways according to the actor's discretion, accommodating multiple reasonable interpretations on review. *See, e.g., Renico*, 130 S. Ct. at 1865. *Brady*, however, imposes a straightforward disclosure requirement with fewer options for correct application, and correspondingly fewer reasonable outcomes in any given set of factual circumstances when material evidence is not disclosed. *See, e.g., Kyles*, 514 U.S. at 434.

Notwithstanding the foregoing discussion, these AEDPA principles, tailored to the *Brady* materiality context, require that we accord the state court's determination deference in the instant case. Therefore, we may only grant habeas if, based on the facts of this case, any reasonable jurist would agree that the *Brady* evidence was material. As discussed below, AEDPA's exacting standard is met in this case, entitling Petitioner to relief.

## II.    State Court Opinion

In adjudicating Petitioner's *Brady* claim, the last reasoned decision of the Ohio state court found that Petitioner "asserted that the state wrongfully withheld exculpatory evidence that on March 12, 1986 . . . Debra Ogle was seen alive in the parking lot of her apartment complex by [several] witnesses who went to high school with her."

*Montgomery*, 482 F. Supp. 2d at 976 (quoting *State v. Montgomery*, 1999 Ohio App. LEXIS 266, at * 8 (Ohio Ct. App. 1999)).  The Ohio court concluded that "this isolated information, recorded in the course of an ongoing investigation when all of the facts were still being pieced together and in the face of overwhelming evidence presented at trial that Ogle had been killed on March 8, 1986, did not undermine confidence in the outcome of the trial."  *Id*.

As previously discussed, AEDPA mandates that in evaluating a petition for a writ of habeas corpus, we

> consider whether the [state court's] decision applies a rule that contradicts such law and how the decision confronts the set of facts that were before the state court.  If the state[]court decision identifies the correct governing legal principle in existence at the time, a federal court must assess whether the decision unreasonably applies that principle to the facts of the prisoner's case,

*Cullen*, 131 S. Ct. at 1399, by "determin[ing] what arguments or theories supported, or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e Supreme] Court."  *Harrington*, 131 S. Ct. at 786.

In this case, in contrast to *Harrington*, the state court explained its basis for denying Petitioner's habeas claim.  *See id*. ("Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here [where the state court disposed of a claim in a summary order], could have supported the state court's decision.")  If the state court articulated its reasons, the habeas court must identify and evaluate those reasons under § 2254(d); only if the state court did not articulate its reasons must the habeas court hypothesize as to the state court's reasoning, and evaluate those hypothetical reasons.  *See id*.  In evaluating the state court decision in this case pursuant to AEDPA, we need not hypothesize as to the state court's reasoning.  Instead, we base our decision on the reasoning articulated by the state supreme court.

As explained by the district court, the state court stressed, in dismissing Petitioner's *Brady* claim, that the report was immaterial "in the face of overwhelming evidence presented at trial that Ogle had been killed on March 8, 1986." *Montgomery*, 482 F. Supp. 2d at 976. This analysis constituted an unreasonable application of Supreme Court precedent. It overlooked the Supreme Court's admonition that *Brady* materiality "is not a sufficiency of evidence test," *Kyles*, 514 U.S. at 434, and missed the relevant legal question under *Brady* and its progeny, namely, whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id*. at 435. By ignoring the nature of the evidence, and focusing entirely on the quantum of available evidence, the state court confused *Brady* materiality with a test for sufficiency of the evidence, thus unreasonably applying the *Brady* materiality standard to the facts of this case.

Although the majority's analysis attempts to explain that the state court's dismissal of Petitioner's *Brady* claim was reasonable, as discussed more fully below, the majority is unable to muster any persuasive arguments that the state court's decision was a reasonable application of established Supreme Court precedent. When the facts of this case are assessed through the narrow *Brady* materiality rule, the state supreme court's determination falls short of satisfying even the exceedingly deferential AEDPA standard of review applicable in this case. The majority's argument, which relies on numerous factual and legal errors to reach its conclusion that the state supreme court's decision was not an unreasonable application of federal law, does not demonstrate the contrary.

### III.    The Majority's Factual Errors

Pursuant to AEDPA, we presume that the state court's factual findings are correct absent clear and convincing evidence to the contrary. *See Lundgren*, 440 F.3d at 763; 28 U.S.C. § 2254(e). Our deference to the state court's factual findings notwithstanding, a habeas court must, to some extent, grapple with a case's relevant facts as found by the state court. *See Cullen*, 131 S. Ct. at 1407. Specifically, we must review the factual record before the state court in order to evaluate whether the state court unreasonably applied clearly established federal law to the facts. *See id*. This prerequisite is never

more significant than in a *Brady* case where "we consider [the suppressed evidence] in light of the evidence available for trial that supports the petitioner's conviction." *Jells*, 538 F.3d at 502.

The majority implicitly acknowledges this requirement, and uses some of the facts in analyzing the report's materiality. (*See* Maj. Op. at 16-17, 19-22.) But, the majority's cursory examination of the relevant facts cannot provide an adequate basis for assessing the reasonableness of the state court's application of *Brady* to the facts before it. Even considering the substantial deference that AEDPA mandates, the majority's perfunctory review is inadequate. *See Harris v. Haeberlin*, 526 F.3d 903, 910 (6th Cir. 2008) ("[E]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.") (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 324 (2005)).

Had the majority thoroughly analyzed the factual record before the state court, it would have apprehended the egregious mistakes that the state court made in denying Petitioner's *Brady* claim. Instead, the majority finds that the report is not material under *Brady* by glossing over the veracity and credibility problems affecting several pieces of inculpatory evidence, and ignoring the Supreme Court's directives to look at the entire case from all perspectives. *See Harrington*, 131 S. Ct. at 789-91. Therefore, prior to discussing the state court's unreasonable application of clearly established Supreme Court precedent, and the majority's equally deplorable misapplication of *Brady* in denying Petitioner a writ of habeas corpus, it is necessary to identify the majority's factual missteps which handicap its ability to perform a proper AEDPA analysis of Petitioner's *Brady* claim.

As an initial matter, there are several problems with the majority's recitation of the facts. The majority recounts that "[Petitioner] had purchased a .380 caliber semi-automatic pistol and ammunition just weeks before the murders and was wearing a dark hooded jacket with the hood tied tight around his face when he entered the gun shop to purchase the pistol." (*Id*. at 4.) Although the majority represents its description of Petitioner's apparel as established fact, this detail is not as certain as the majority

implies. In her testimony during Petitioner's trial, Trisha M. Blackburn, the salesperson working at Cleland's Gun Shop when Petitioner purchased the gun, affirmed that Petitioner "had on a windbreaker tied closely around his face" when he came to the gun shop. (J.A. at 6114.) However, Blackburn admitted at trial that when she initially spoke with police officers she was unable to "give[] them a description of how [Petitioner] was dressed on that particular day." (*Id*. at 6113-14.) Moreover, when pressed, Blackburn stated that she did not remember either what "the other customer[s] ha[d] on that" day, (*id*. at 6114-15), or what she was wearing that day. (*See id*. at 6115.) Nor did Blackburn recall "how [any Cleland customers between March and July 1986] were dressed when they came in." (*Id*. at 6118-19.) Nevertheless, Blackburn maintained that she "specifically recall[ed] what [Petitioner] was wearing on that particular day." (*Id*. at 6115.) Far from being the ironclad fact represented by the majority, Blackburn's memory of Petitioner's dress on that date is dubious at best.

Next, the majority notes that "[Petitioner] and Tincher and Ogle were acquaintances." (Maj. Op. at 4.) However, Albert Earl, Jr. testified at Petitioner's trial that Heard was also acquainted with both victims. (*See* J.A. at 5886-87.) Thus, contrary to the majority's intimation, because both Petitioner and Heard were acquainted with the victims, this fact is not probative of the culprit's identity.

Moreover, in repeating the pertinent facts for its analysis, the majority lists the evidence implicating Petitioner as follows:

> First, both victims were shot with a .380 pistol that [Petitioner] bought approximately two weeks before [Ogle's and Tincher's] deaths. Second, [Petitioner's] uncle saw [Petitioner] drunk and in possession of the murder weapon only a few hours before Tincher was found shot dead approximately one-half of a mile from [Petitioner's] home on March 8. Third, [Petitioner] admitted to being at Ogle['s] and Tincher's apartment on March 8, and it is undisputed that Ogle was reported missing sometime shortly after [Petitioner's] acknowledged visit. Fourth, [Petitioner] was wearing a dark blue pin-striped suit jacket during the night in question, and a few hours after Tincher was found dead and Ogle disappeared, [Petitioner] took a dark blue pin-stripped suit to the dry cleaners that was soaking wet and that made a "brownish dripping mess on the floor" as it dried. Fifth, Heard testified that he was with

[Petitioner] and witnessed [Petitioner] shoot Ogle. Sixth, on the evening of March 12, [Petitioner's] mother delivered the murder weapon to [a police officer] at a nearby Way-Lo station. Finally, [Petitioner] showed police officers where Ogle's body was on March 12.

(Maj Op. at 16-17.)

Although the majority lists several of these facts to demonstrate Petitioner's opportunity to commit the crimes, because Petitioner and Heard were admittedly together much of the evening, these facts are equally if not more demonstrative of Heard's opportunity to commit the crimes. The majority states that "[Petitioner] admitted to being at Ogle['s] and Tincher's apartment on March 8." (*Id*. at 16) However, in his testimony at Petitioner's trial, Heard admitted that he was also present at Ogle's and Tincher's apartment on the night of March 8, 1986. (*See* J.A. at 6460-62.) Therefore, Petitioner's presence at the victims' apartment does not indicate that he, rather than Heard, committed the crimes.

The majority further states that Petitioner's "uncle saw [Petitioner] drunk and in possession of the murder weapon only a few hours before Tincher was found shot dead." (Maj Op. at 16.) First, it is noteworthy that Petitioner's uncle, Randolph Randleman, testified that when Petitioner and Heard arrived drunk and rowdy at Randleman's house in the early morning of March 8, Petitioner was carrying a .380 caliber semi-automatic pistol. (*See* J.A. at 6155-56.) However, Randleman "took [the gun] from [Petitioner, and] threw it on top of the refrigerator." (*Id*. at 6156-57.) Randleman further testified that both "Heard and [Petitioner] left [Randleman's house] out of the kitchen . . . . So, either one could have taken [the gun]." (*Id*. at 6179.) Therefore, contrary to the majority's suggestion, Randleman's testimony indicates that both Petitioner and Heard had the opportunity to take the gun off of the top of Randleman's refrigerator on their way out of his house that night. However, as Randleman himself admitted, he "d[idn't] know who took [the gun] . . . [he] never s[aw] anybody take the gun . . . . So, either [Petitioner or Heard] could have taken it." (*Id.*)

Furthermore, in its factual recitation, the majority lists the following facts that were introduced at trial through Heard's testimony:

[Petitioner] was armed with a .380 caliber pistol the morning of March 8; [a] cab took [Petitioner] and Heard to Ogle['s] and Tincher's apartment on Hill Avenue at [Petitioner's] direction, where both [Petitioner] and Heard entered the apartment; Ogle was getting ready to go to work and Tincher, although she popped out to say hello, was still in bed; Ogle agreed to give [Petitioner] and Heard a ride to [Petitioner's] mom's apartment on Airport Road; [Petitioner,] sitting in the front seat, gave Ogle the directions and eventually told her to stop on the side of the road on Hill Avenue; Ogle and [Petitioner] got out of her car and walked roughly forty yards into a field or wooded area off Hill Avenue; Heard heard two gunshots and saw Ogle's body laying on the ground; [Petitioner] rushed back to Ogle's car and motioned for Heard to get in the front passenger's seat as [Petitioner] got into the driver's seat and drove Ogle's car back to the victims' apartment complex; [Petitioner] picked a gun up off the floor of the car, exited the vehicle, and told Heard to take the car; Heard then left the car and took Ogle's wallet as he abandoned the car roughly one block from his home.

(Maj. Op. at 4-5 (internal modifications omitted).)

There are several reasons to question the credibility of Heard's testimony.[1] Foremost, Heard had a significant motive to implicate Petitioner. Initially Heard, like Petitioner, was indicted and charged with two counts of aggravated murder that carried three death penalty specifications. However, by agreeing to testify at Petitioner's trial, Heard was able to plead guilty to one count of complicity to murder, exposing Heard to a term of imprisonment ranging between fifteen years to life, with the possibility of parole after serving twelve and a half years of incarceration. (*See* J.A. at 6488-89.)

Additionally, at least two pieces of physical evidence tend to implicate Heard: it is undisputed that Ogle's car was found on the same block as Heard's house (*see id.* at 6419-20); and officers testified at Petitioner's trial that in the course of a search conducted pursuant to a valid search warrant, police officers found Ogle's wallet in Heard's bedroom. (*Id.* at 6431-32.)

---

[1] The Chief Judge's concurrence effectively disregards the flaws in Heard's testimony, stating that "[d]espite numerous problems with Heard's version of the murders . . . what is important is that Heard sat on the witness stand and told the jury that he and Montgomery had committed the murders, that he had accepted punishment for his role, and that Montgomery had been the shooter." (Batchelder, C.J. Con. at 30.) By cherry picking the facts favorable to her position, the Chief Judge oversimplifies the evidentiary complexities inherent in this case, improperly skewing her analysis against a finding of materiality.

There were also several discrepancies between Heard's testimony and other evidence presented at Petitioner's trial. Whereas Earl testified earlier in Petitioner's trial that Heard was acquainted with both Tincher and Ogle (*see id*. at 5887), Heard denied having any relationship with either victim. (*See id*. at 6460.) Moreover, in recounting his version of Ogle's murder on the witness stand, Heard stated that he "heard two gunshots," after which he "look[ed] back in [Petitioner's] direction . . . and [Ogle] was lying on the ground." (*Id*. at 6465.) However, in his report of Ogle's autopsy, the coroner, Dr. Christopher Reed Desley, testified that the "main external findings" of the autopsy "were the presence of three gunshot wounds." (*Id*. at 6311.) Finally, Detective Arthur M. Marx testified that Heard's story was incredible because from Heard's alleged vantage point, "it was physically impossible to see what [Heard] said he saw," namely that Petitioner shot Ogle in the field. (*Id*. at 6556.)

The veracity of Heard's testimony is further called into question by his concession on cross-examination that he told police several different stories relating to the crimes. (*See id*. at 6472-76.) "[T]he first thing he told [police was that he] didn't know anything about it." (*Id*. at 6473.) The "second thing [Heard] told [police]" was that he had "seen two white girls get killed." (*Id*.) The "third thing [Heard] told police" was that he "has seen a black male . . .that he knew as a dope dealer . . . driving the [victim's] car . . . [d]own [an] alleyway . . . [a]nd [that Heard] didn't know who he was . . . [or] what he had done with the car." (*Id*. at 6474.) The fourth story Heard told police was that he "had gone to a carwash and there an unknown black male told [him] about two white girls being killed." (*Id*. at 6475.) Thus, the version of the crimes that Heard recounted on the witness stand at Petitioner's trial, and that the majority apparently credits, was his fifth story.

Heard's testimony is therefore weak in several respects: (1) Heard had a strong motive to implicate Petitioner in order to exculpate himself; (2) it is inconsistent with several other pieces of trial evidence; and (3) Heard was proven untrustworthy, having told the authorities five versions of the facts. In its recitation of the facts, the majority does mention the credibility problems plaguing Heard's testimony. (*See* Maj. Op. at 6.)

However, although in analyzing the materiality of the report in conjunction with the facts presented at trial, the majority acknowledges the aspersions cast on Heard's testimony, (*see id*. at 19-20), it ignores the probative value of this evidence. Instead, in its discussion, the majority accords significant weight to facts introduced through Heard's testimony. This seemingly willful blindness to the weaknesses of Heard's testimony unduly tips the scales against a finding of materiality in contravention of AEDPA's requirement that a habeas court give comprehensive consideration to all potential factual scenarios. *See Harrington*, 131 S. Ct. at 789-91.

The majority makes further factual errors in its materiality analysis by surmising what may have happened had Petitioner been aware of the report at the time of his trial, and finding, based on these conjectures, that the report would not have helped Petitioner's case. The majority states that "[Petitioner] ignores the likely damaging evidence flowing from the report. Most significantly, the report . . . undermines the defense theory that Heard . . . was the triggerman." (Maj. Op. at 20.) The majority also contends that the time line of events suggested by the report "entirely subverts [Petitioner's] defense theory that Heard was the killer." (*Id*. at 21.) Thus, the majority finds that the report would not have assisted Petitioner because it was not directly in line with Petitioner's defense theory at trial. However, in unreasonably narrowing its analysis to the precise factual arguments actually presented at trial, the majority ignores the equally plausible likelihood that the report could have led Petitioner to additional information, witnesses and defense theories. Such one-sided conjecture by the majority is not a persuasive basis for finding that the report is not material.

Similarly, the majority states that

[Petitioner] also ignores the fact that any witnesses who testified on his behalf regarding the alleged March 12 sighting of Ogle would have been subject to cross-examination, during which the State could have raised factual contradictions . . . . [T]he State quite likely could have successfully obtained the witnesses' admissions that they had in fact been mistaken about the sighting of Ogle and had instead seen her sister.

(*Id*. at 21.)  However, the fact that individuals retracted their statements six years after Petitioner's trial does not indicate that they would have done so six years earlier on the eve of Petitioner's trial.**2**  Moreover, whereas the individuals only retracted their statements six years after Petitioner's trial concluded, they initially made the statements on March 12, 1986, just a month prior to Petitioner's trial.  Thus, if temporal proximity is any indication, it is possible that the individuals who claimed that they saw Ogle on March 12, 1986 would have stood by their account throughout Petitioner's trial.  The majority's contention that "the State quite likely could have successfully obtained the witnesses' admissions that they had in fact been mistaken" in stating that they saw Ogle after she was allegedly murdered, (*id*.), is nothing more than pure speculation.  There is simply no way to evaluate whether the statements would have been retracted or undermined at Petitioner's trial.

The majority's analysis in this case is riddled with factual problems, which in their own right represent a failure to attempt a thorough reconstruction of the broad range of potential factual scenarios at play in the case, and thus constitutes a misapplication of AEDPA deference.  *See Harrington*, 131 S. Ct. at 789-91.  The majority also glosses over several reliability issues affecting the evidence presented at Petitioner's trial, and makes numerous faulty factual suppositions.  It is only based on this faulty factual foundation that the majority arrives at its conclusion that the report is not material.

### IV.    The Majority's Legal Errors

The majority compounds its analytical problems, and wrongfully denies Petitioner a writ of habeas corpus, by misconstruing the standard for *Brady* materiality and applying its skewed legal framework to its unsupportable version of the facts.

---

**2**Although the Chief Judge's concurrence states as fact that "[w]ithin the next couple of days," after receiving the report, "the police knew that the report was not only implausible but just plain wrong," (Batchelder, C.J. Con. at 26), and that the individuals who reported seeing Ogle alive on March 12, 1986, "in fact, realized that same night that they had seen Ogle's sister and not Ogle," (*id*. at 28), the Chief Judge provides no record support for these curious factual assertions.

The majority purports to review the state court's adjudication of Petitioner's *Brady* claim to ensure that the state court did not "unreasonably appl[y] *Brady* to the facts of [Petitioner's] case." (Maj. Op. at 13.)  However, under the guise of according the state court decision AEDPA deference, the majority abdicates its duty on habeas "to search for constitutional error with painstaking care," *Kyles*, 514 U.S. at 422, and rubber stamps the state court's opinion.  Thus, the majority adopts the state supreme court's legal errors, and integrates them into its analysis of Petitioner's *Brady* claim.

In formulating the requirements for *Brady* materiality, the majority states that

> the *Brady* standard is not met if the petitioner shows merely a reasonable *possibility* that the suppressed evidence might have produced a different outcome; rather a reasonable *probability* is required . . . . In *Kyles*, the Supreme Court elaborated . . . that *Brady* materiality is not a sufficiency of evidence test.  Nor does *Brady* require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in . . . a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence . . . . [T]he obligation of a reviewing court [is] to consider the totality of the evidence– and not merely exculpatory facts in isolation– when evaluating a claim of error for its prejudicial effect.

(Maj. Op. at 14-15 (internal citations and quotation marks omitted) (emphasis in original).)  Furthermore, quoting *Wong v. Belmontes*, 558 U.S. __, 130 S. Ct. 383, 386 (2009), the majority states that

> [i]n evaluating the question of prejudice, it is necessary to consider all the relevant evidence that the jury would have had before it if the defense had pursued a different path–not just the mitigation evidence the defense could have presented, but also the other evidence that almost certainly would have come in with it.

(Maj. Op. at 15 (internal modifications omitted).)  Thus, according to the majority, "a reviewing court, when considering a defendant's claim of prejudice, must evaluate the weight of mitigating and aggravating evidence regarding the defendant's guilt, rather than simply tallying instances of mitigation." (*Id*. at 16 (internal emphasis omitted).)  After describing the facts implicating Petitioner, the majority applies this standard to

conclude that because of the "considerable evidence of [Petitioner's] guilt," (*id*. at 18), the report is not material under *Brady* and its progeny.

The majority makes three significant missteps in its materiality formulation. First, by stating that "the *Brady* standard is not met if the petitioner shows merely a reasonable possibility that the suppressed evidence might have produced a different outcome; rather a reasonable probability is required," (*id*. at 14), the majority distorts the meaning of "reasonable probability." The Supreme Court has stated that the "touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether [a] defendant would more likely than not have received a different verdict with the evidence." *Kyles*, 514 U.S. at 434. Rather, "[a] 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." *Id*. at 435. *Kyles* contrasted "reasonable probability" with "likely" to illustrate that the materiality burden, while high, does not require a showing that disclosure of the exculpatory evidence would "likely" have produced a different result. The majority, however, contrasts "probability" with "possibility," tacitly changing the meaning of the word "probability" in the materiality context to require a likelihood of a different result for *Brady* materiality.

Second, although the majority recites the correct legal standard for determining *Brady* materiality, the majority nonetheless applies a sufficiency of the evidence standard in assessing the report's materiality. The Supreme Court stated unequivocally in *Kyles* that *Brady* materiality "is not a sufficiency of evidence test," and emphasized that "[a] defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict." *Id*. at 434-35. Nevertheless, in finding that the report is immaterial, the majority lists the inculpatory evidence presented at Petitioner's trial, and finds that the report alone does not affect the "considerable evidence of [Petitioner's] guilt." (Maj. Op. at 18.) The majority simply tallies up the inculpatory pieces of

evidence and pits them against what it regards as the single piece of exculpatory evidence suppressed in this case, without evaluating the quality and strength of the various pieces of evidence. In so doing, the majority ignores both the qualitative nature of the *Brady* materiality inquiry, and the serious credibility issues undermining the evidence against Petitioner. This constitutes legal error.

Third, in an attempt to bolster its finding of immateriality, the majority asserts that the report is cumulative, and thus not material for *Brady* purposes, stating that "[w]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material." (*Id.* at 18 (quoting *Byrd v. Collins*, 209 F.3d 486 (6th Cir. 2000).) The majority mistakes the report's potential purpose. As discussed further below, because the case against Petitioner was significantly weaker than the majority suggests, the report casts further doubt on Petitioner's guilt, and illuminates additional avenues that the defense could have pursued, thereby highlighting the existing difficulties with Petitioner's conviction and sentence.[3] Thus, contrary to the majority's contention, the report was far from cumulative.

---

[3]The Chief Judge's concurrence contends that the report is not material because "neither the report itself nor the substance of that report could have caused a jury to have a reasonable doubt about the relevant issue here – whether Montgomery, rather than Heard, murdered Ogle. The police report at issue here is simply immaterial to that question." (Batchelder, C.J. Con. at 26.) The Chief Judge's analysis of the *Brady* materiality requirement, for which no authority is cited, is excessively narrow.

The *Brady* materiality test, as framed by the Supreme Court, asks whether in the "absence" of the suppressed evidence, a petitioner "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. The Supreme Court intended to avoid limiting the materiality inquiry to asking merely, as does the concurrence, whether the suppressed evidence would likely have prevented Petitioner's conviction under the theory of the case developed by Petitioner without the benefit of the suppressed information. *See id.* ("The question is not whether [a] defendant would more likely than not have received a different verdict with the evidence"). *Brady* draws the materiality question more broadly, asking whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.*

Thus, for suppressed information to be material, it must constitute an important piece of evidence highly relevant to the questions of Petitioner's guilt or punishment. In evaluating materiality, we need not, and indeed cannot, know the universe of evidentiary ramifications that a suppressed piece of evidence could have had if timely disclosed. Rather, in assessing *Brady* materiality, a court's task is to determine whether "there is a reasonable probability" that had the suppressed evidence been timely disclosed, and the petitioner's counsel had appropriate opportunity to follow-up on the evidence, and properly use it to the petitioner's advantage, the result of the trial might have been different. This point is lost on both the majority and the Chief Judge.

In finding the report cumulative, the majority also misunderstands the legal definition of cumulative evidence. Our Court has expressed frustration that "[o]ur cases . . . do not tell us clearly when evidence becomes sufficiently different to no longer be 'cumulative' or at what level of generality one must compare the evidence." *Vasquez v. Bradshaw*, 345 F. App'x 104, 120 (6th Cir. 2009). However, we have most often stated that "new evidence" is not cumulative if it "differs both in strength and subject matter from the evidence actually presented at [trial]." *Goodwin v. Johnson*, 632 F.3d 301, 327 (6th Cir. 2011); *see also Tibbetts v. Bradshaw*, 633 F.3d 436, 444 (6th Cir. 2011) (finding that evidence that deals with "the exact same subject" as the evidence presented at the petitioner's trial was cumulative because "in order to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way– in strength and subject matter from the evidence actually presented . . . ." (internal quotation marks and citations omitted)); *Landrum v. Mitchell*, 625 F.3d 905, 930-32 (6th Cir. 2010) (finding undisclosed evidence cumulative when "[t]rial counsel presented most of the same facts" because "[t]he petitioner must present new evidence that differs both in strength and subject matter from the evidence actually presented . . . not cumulative mitigation evidence"); *Beuke v. Houk*, 537 F.3d 618, 645 (6th Cir. 2008) ("To establish prejudice, the new evidence that a habeas petitioner presents must differ . . . in strength and subject matter – from the evidence actually presented at sentencing . . . . evidence [that] mirrors the evidence introduced during the penalty phase" is insufficient to meet this standard); *Johnson v. Bagley*, 544 F.3d 592, 603 (6th Cir. 2008) (finding that petitioner's trial counsel provided ineffective assistance by failing to investigate mitigation evidence, and finding that "[c]ompetent counsel could have put on evidence that differed in . . . strength and subject matter – from the evidence actually presented at sentencing" (internal quotation marks and citations omitted)); *Vasquez*, 345 F. App'x at 120 (describing this as "our most skeptical formulation"). The degree of difference necessary for new evidence to be non-cumulative may depend on the strength of the evidence against a petitioner. *See Vasquez*, 345 F. App'x at 120.

The report presents entirely new information, factually unrelated to any of the evidence available to Petitioner at the time of his trial, and which was untouched by the

credibility problems affecting some of the trial evidence. No other piece of evidence connected with Petitioner's case suggested that Ogle was not killed on March 8, 1986, and no other evidence came from Ogle's high school classmates who were otherwise uninvolved with Petitioner's trial. Particularly because of the weakness of the case against Petitioner – indeed the evidence against Petitioner was largely circumstantial with only Heard's substantially untenable testimony directly implicating Petitioner – the report was not cumulative. *See id*. It is irrelevant that the report could have served a similar purpose as evidence actually presented at Petitioner's trial.

The majority opinion, therefore, commits three significant errors in its formulation of the *Brady* materiality inquiry. It first raises the quantum of proof required for a showing of materiality under *Brady* by misconstruing the meaning of "reasonable probability," and effectively defining it as a likelihood. The majority then compounds its error by transforming its materiality inquiry into a sufficiency of the evidence test, and finds that the report is not material because it does not discount the inculpatory evidence presented at Petitioner's trial. Third and finally, the majority hastily dismisses the report as cumulative despite the wholly new evidence it contained.

## V. Application

The majority's review of the state court's finding that the report is not material is skewed by the majority's misconception of the facts, as well as its misstatement of the legal standard for *Brady* materiality. Moreover, although the majority states that "a reviewing court, when considering a defendant's claim of prejudice, must evaluate the weight of mitigating and aggravating evidence regarding the defendant's guilt, rather than simply tallying instances of mitigation," (Maj. Op. at 16), the majority's prejudice analysis is in fact no more than a tally, pitting the list of facts presented at trial against the report. Based on its erroneous analysis, the majority finds that the report is not material. However, when the totality of facts in this case are evaluated under the proper legal standard, it becomes obvious that the state court unreasonably applied federal law

in finding that the report is not material.  It is therefore appropriate to perform a separate materiality analysis here.[4]

In a *Brady* materiality inquiry, a reviewing court cannot just enumerate the facts and reach a conclusion.  Instead, it must evaluate any holes and weaknesses in the state's case against a defendant and determine whether, given this totality of the evidence, inclusion of the suppressed exculpatory evidence creates a "reasonable probability" of a different outcome.

As previously discussed, the Supreme Court has clearly explained that "the touchstone of materiality is a 'reasonable probability' of a different result," *Kyles*, 514 U.S. at 434, meaning that "the government's evidentiary suppression undermines confidence in the outcome of the trial." *Id*.  The *Brady* materiality inquiry assesses the quality and strength of the evidence available during a defendant's trial in light of the suppressed evidence. *See Jamison*, 291 F.3d at 388-89.  *Brady* does not test whether the suppressed evidence left "an insufficient evidentiary basis to convict," *Kyles*, 514 U.S. at 435, but whether the suppressed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id*.

In this case, the report "undermine[s] confidence in the verdict," compounding the already numerous holes in the prosecution's case.  The state's case against Petitioner relied primarily on several pieces of circumstantial evidence allegedly connecting Petitioner to the crimes, and Heard's account of Petitioner shooting Ogle.  However, the probative value of several of those central pieces of circumstantial evidence is questionable.

---

[4]Although the majority accuses this dissent of "undertak[ing] a *de novo* review of the record," (Maj. Op. at 8 n.1), any fair reading clarifies that this dissent is careful to apply the proper deferential standard required under AEDPA.  Apparently the majority believes that only by "undertak[ing] a *de novo* review" of a claim can a federal court grant a writ of habeas corpus. *See, e.g.*, *Doody v. Ryan*, No. 06-17161, 2011 U.S. App. LEXIS, at *38 (9th Cir. May 4, 2011) (en banc) ("Our colleagues in dissent chastise us for reaching these conclusions, accusing the majority of 'once more pay[ing] mere lip service to AEDPA and then proceed[ing] as though it does not exist.' The dissent would prefer that we simply parrot the findings made during the state court proceedings and call it a day. However, if we succumb to the temptation to abdicate our responsibility on habeas review, we might as well get ourselves a big, fat rubber stamp, pucker up, and kiss The Great Writ good-bye." (internal citations omitted)).

First, a number of pieces of evidence are used to suggest that Petitioner was the man with a dark hooded jacket who was seen leaving Tincher's car just before her body was found, (*see* J.A. at 6094), but each piece of evidence suffers from some significant defect. Specifically, the state presented evidence that the saleswoman at Cleland's Gun Shop testified that Petitioner "had on a windbreaker tied closely around his face" when he came to the gun shop. (*Id*. at 6114). However, that same saleswoman admitted that she could not remember what any other customer before or since was wearing. (*See id*.) Moreover, while it is true that police officers found a dark hooded leather jacket during a search of Petitioner's apartment, (*see id*. at 6362), none of the witnesses who saw the man leave Tincher's car on the morning of March 8, 1986 could identify the jacket's color or fabric. That Petitioner owned a black hooded jacket thus means very little in this context.

Second, the state also presented the following evidence in attempting to demonstrate Petitioner's opportunity to commit the crimes: Petitioner was acquainted with Tincher and Ogle, (*see id*. at 5887); Petitioner was drunk in the early morning hours of March 8, 1986, when he arrived at Randolph Randleman's house, (*see id*. at 6155, 6171); Randleman disarmed Petitioner, and placed Petitioner's gun on the top of Randleman's refrigerator, (*see id*. at 6157); Petitioner left Randleman's residence in a taxicab, passing through Randleman's kitchen on his way out, and could have taken the gun from the top of the refrigerator, (*see id*. at 6160, 6177-79); and the taxicab took Petitioner to Tincher's and Ogle's apartment. (*See id*. at 6207-10). Heard and Petitioner were, however, together the entire evening. Therefore, these facts demonstrate Heard's opportunity to commit the crimes to at least the same extent that they demonstrate Petitioner's opportunity.

Finally, the remaining circumstantial facts presented at Petitioner's trial provide conflicting suggestions of guilt. Some facts tend to implicate Petitioner, while others tend to implicate Heard. These include the following: police officers found Ogle's wallet in Heard's bedroom, (*see id*. at 6431-32); Petitioner was wearing a blue pinstripe jacket on the night in question which he took to the dry cleaners "soaking wet" where

"it was dripping . . . a yellowish brown, brownish  . . . mess on the floor," (*id*. at 6279-80); Ogle's car was found near Heard's house, (*see id*. at 6419-20); Petitioner was cooperative when interviewed by the police, (*see id*. at 6500-08); Petitioner arranged for his mother to surrender the gun to police officers, (*see id*. at 6510-13, 6557); and Petitioner led police to a wooded field where police eventually found Ogle's body. (*See id*. at 6544-47.)  The circumstantial evidence against Petitioner presented at trial was thus weak and inconclusive.

Heard's testimony was also a critical element of the state's case but his testimony is riddled with credibility problems.  Heard testified that Petitioner killed Ogle, ordered Heard to drop Petitioner off at Tincher's and Ogle's apartment so that he could kill Tincher as well, and instructed Heard to take Ogle's car.  (*See id*. at 6463-66.)

There were three principal problems with Heard's account.  First, Heard had pled guilty to one count of complicity to murder, and in exchange for his testimony at Petitioner's trial, avoided risking conviction for aggravated murder and the possible attendant death sentence. (*See id*. at 6488-89.)  Heard therefore had a significant motive to testify against Petitioner.  Second, Heard's testimony was inconsistent with several other pieces of trial evidence:  (1) Heard denied an acquaintance with either Ogle or Tincher, (*see id*. at 6460), however, Earl testified that Heard was acquainted with both Ogle and Tincher, (*see id*. at 5887); (2) whereas the coroner testified that Ogle's body bore three gunshot wounds, (*see id*. at 6311), Heard testified that he "heard two gunshots," (*id*. at 6465); and (3) Detective Arthur M. Marx testified that Heard could not have seen the crime take place in the wooded field from his alleged vantage point inside Ogle's car which was parked on the side of the road. (*See id*. at 6556.)  And, third, in addition to the version of the crimes he described on the witness stand, Heard told authorities four other stories regarding the crimes. (*See id*. at 6472-76.)

The questionable nature of the evidence against Petitioner is compounded by Officer Keefe Snyder's testimony regarding Petitioner's version of the events.  Snyder testified that Petitioner "told [Snyder] that he was willing to talk . . . to prove it was not [Petitioner] that had killed the two girls . . . . [Petitioner] told [Snyder] that [Petitioner

and Heard] had been at [Randleman's] house . . . [Petitioner] and Glover Heard . . . left the house [at] approximately 5:30 in the morning . . . and were intending to go to [Petitioner's] apartment." (*Id*. at 6499.)  Petitioner admitted that "he had a loaded .380 caliber pistol with him at that time.  [Petitioner] stated that he had Glover Heard carry the pistol because [Petitioner] knew [there were outstanding] warrants on him and he was afraid that he would be patted down by the police." (*Id*. at 6499-500.)  Snyder explained that Petitioner then stated that

> when he got in[to] the cab . . . he had only $10.  So, [Petitioner and Heard] took the cab as far as they could on the $10 . . . . So, [Petitioner] stopped the driver and got out of the cab . . . [and Petitioner and Heard] walked down to . . . the apartment of Debbie Ogle and Cindy Tincher . . . . [Petitioner] stated that they knocked on the door, intending to get a ride from the girls to his apartment . . . . Debbie Ogle answered the door. They were allowed to enter the apartment.  They asked for a ride. Debbie Ogle informed them that she was getting ready for work and that she would take them . . . . [Petitioner and Heard] waited there in the apartment, and in the meantime, Cindy Tincher . . . came out if the bedroom and said hi to them . . . . Cindy Tincher then returned back into the bedroom.  After [Ogle] was ready, [Petitioner], Debbie Ogle . . . and Glover Heard left the apartment, leaving [Tincher] at the apartment . . . . [T]hey then proceeded to [Petitioner's] apartment . . . . And at that time Glover Heard and Debbie Ogle dropped [Petitioner] off at . . . his apartment . . . . When Debbie Ogle and Glover Heard dropped [Petitioner] off at [Petitioner's] apartment . . . [Heard] told [Petitioner] that he wanted to keep the gun with him, but didn't tell [Petitioner] what for . . . . During the course of the [next] day, [Petitioner] state[d] that [Heard] returned his pistol.  Upon checking it, [Petitioner discovered] that the clip [was] empty.  And [Petitioner] stated [that] it was loaded when [Petitioner] had given it to [Heard].  [Petitioner] asked [Heard] what happened?

(*Id*. at 6501-04.)  Petitioner then equivocated, and first stated that Heard responded "you don't even want to know." (*Id*. at 6504.)  However, later Petitioner told Snyder that

> Heard told him, [Tincher] crossed [Heard], so [Heard] offed her . . . . [Petitioner] stated that Glover Heard threw [Petitioner's] pistol, the .380. [Petitioner] . . . picked up the pistol and he pulled back the slide intending to put one [bullet] into the chamber, but the pistol was empty. [Petitioner] stated that at this point Glover Heard stated, don't even try it, and reached under the seat, [and] pulled out another pistol.

(*Id*. at 6507.) Later, Petitioner told Officer Larry Przeslawski that "he may be able to show [the police] where [Ogle's] body" was because Heard had driven him past the location, bragging about the crimes. (*Id*. at 6391.) However, Petitioner maintained that "[Heard] was the one [who] killed both girls. [Petitioner was] only guilty of getting [Tincher] out of the apartment so [Heard] could kill her because she was the only one [who] could . . . tie them in with [Ogle]." (*Id*. at 6397.) The veracity of Petitioner's account, like much of the other direct evidence regarding the crimes in this case, is questionable because Petitioner provided the police with at least two conflicting stories. (*See id*. at 6505.) Nevertheless, as Petitioner's version of the facts was evidence introduced at trial, it must be accounted for in an analysis of the report's *Brady* materiality.

Although the majority characterizes the evidence against Petitioner as "strong," and "considerable," as illustrated, it is anything but. Rather, as pointed out at Petitioner's trial, (*see id*. at 6493), Petitioner's guilt hinges upon crediting Heard's incredible testimony against Petitioner's equally problematic account. Even without the report, proof of Petitioner's guilt is dubious at best.

The exculpatory evidence contained in the report casts further doubt on the state's already weak case against Petitioner. The report "undermin[es] confidence in the verdict" against Petitioner, and thus is material. *Kyles*, 514 U.S. at 435. A comprehensive review of the facts and applicable law mandates that conclusion in this case, and finding otherwise is patently unreasonable.

The majority's contention that the report is immaterial because it undercuts Petitioner's defense theory entirely misses the mark. The relevant question for *Brady* materiality is whether the suppressed evidence "put[] the whole case in such a different light as to undermine confidence in the verdict." *Id*. Any conflict that the report may have with Petitioner's defense theory notwithstanding, the report sheds light on additional potential defense theories that could have been available to Petitioner, thus further undermining the reliability of an already questionable verdict.

Only by unreasonably applying *Brady*, and ignoring the deeply troubling lack of proof implicating Petitioner, did the state court find that the report was not material. Only by reprising those errors can the majority deny Petitioner a writ of habeas corpus.

## CONCLUSION

For the foregoing reasons, the state court unreasonably applied clearly established federal law by rejecting Petitioner's claim under *Brady v. Maryland*, and we should grant Petitioner a writ of habeas corpus on that ground. Because the majority distorts the facts of this case, and misapplies *Brady* to find that the report is not material, I respectfully dissent.